TUCKER, Judge.
This case is consolidated with case No. 2910, 209 So.2d 316. Both suits arise out of a residential building contract entered into by the owner Mrs. Dorothy Monteleone and Crescent City Construction Corporation. General Guaranty Insurance Company was the surety on the bond.
On June 23, 1965, Crescent City Construction Corporation filed this suit to recover from Mrs. Monteleone both the final payment on the contract and an award for “extras” it installed not provided for in the plans and specifications. Mrs. Monteleone filed a third party demand against General Guaranty praying that it indemnify her for any amount she might have to pay Crescent. General Guaranty filed an answer to the third party demand together with the reconven-party demand together with the recon-ventional demand alleging that the fourth payment made by Mrs. Monteleone to Crescent was premature and that it was entitled to recover both the fourth payment and the last payment due on the contract. General Guaranty also filed a third party action against Crescent, its president, Arthur L. Dahlman and one Ronald G. Schwary alleging Crescent, Mr. Dahlman and Mr. Schwary entered into an indemnity agreement with General Guaranty and were, therefore, liable for any amount it might have to pay Mrs. Monteleone as well as to laborers, materialmen and subcontractors.
On November 12, 1965' Mrs. Monteleone filed suit against Crescent and General Guaranty for damages for defects in the construction of her home. General Guaranty answered and filed a reconventional demand against Mrs. Monteleone and a third party demand against Crescent, Mr. Dahlman and Mr. Schwary as it had in the earlier suit.
The trial court allowed Crescent $1,294.63 for extras installed in Mrs. Monteleone’s home and allowed Mrs. Monteleone credit for items it was stipulated were deleted from her home in the amount of $786.00. It also allowed her $4,155.50 to correct defects in her home but also decreed that she pay Crescent the final payment of $3,773.00. Because the amount allowed Crescent was $5,067.63 and the amount allowed Mrs. Mon-teleone was $4,941.50, there was judgment in favor of Crescent and against Mrs. Monte-leone for $126.13. There was also judgment in favor of General Guaranty and against Crescent and Mr. Dahlman for $3,476.23, an amount it was stipulated General Guaranty had to pay subcontractors when Crescent defaulted. All rights were reserved to General Guaranty to collect all proper costs and attorneys fees due under its surety contract. The reconventional demand of General Guaranty against Mrs. Monteleone was dismissed. From this judgment all parties have appealed.
First we will consider the contentions of Crescent which claims it should have been awarded $5,943.50 for extras instead of the $1,294.63 it was allowed. Initially we will discuss the largest item claimed by Crescent, i. e., $1,516.76 for extra plumbing fixtures over and above the $1,220.00 allowance for these fixtures in the specifications. The trial judge only allowed $296.76 for this item. There is a discrepancy in the testimony as to just how much is claimed. At first Mr. Dahlman testified in definite language that the figure was the amount allowed by the trial judge. In this regard his testimony is as follows:
“Q. And that is the total amount of the amount you’re claiming as the plumbing extra?
“A. Yes, sir.
“Q. And this is arrived at strictly by using a gross amount purchased under the heading of plumbing items from the credits allowed in the specifications ?
Yes, sir. >
And taking into account any credits which may be given you by the plumbing suppliers? d
Yes, sir. >
*313 “Q. And you are actually claiming as a total of all of these invoices which you have before you, the total amount of two hundred and seventy-six dollars, more or less?
BY THE COURT: And Seventy-six cents.
“A. Yes, sir.
However, later in the trial Mr. Dahlman testified that $1,516.76 was the correct amount for plumbing extras. He actually produced invoices from Southern Pipe and Supply Company, Inc. which totalled $3,-742.06. He testified he knew the material ordered was for the Monteleone home by the shipping address. Therefore we will only consider those invoices which indicate the fixtures were shipped to the site of construction of the Monteleone home. The above described invoices totalled $1,503.63. From this must be subtracted the plumbing allowance of $1,220.00 specified in the construction contract, leaving a total due Crescent of $283.63.
Next we will list those extras which we find should be allowed Crescent because the evidence concerning their installation is convincing:
Air purifier $ 385.00
Range hood 59.00
Vacuum system 284.00
Bathroom mirror 20.00
Grass seed 3.60
Ice maker connection 10.13
Extra kitchen shelves 2.06
Lock set 7.54
Two extra feet of roof overhang 135.00
Partition and dressing room door 100.00
Change of doors in kitchen cabinets 100.00
Shelves side of window 38.00
Extra vinyl floor covering 38.00
Base for oven range 135.00
Special cabinet under tub 95.00
Door lock 35.00
Driveway walk 75.00
Marble sills in solarium 50.00
Kitchen cabinets more expensive than those in plans and specifications 775.00
Brick wall in solarium 475.00
Concrete bottom for planters in solarium 35.00
Ceramic tile on ceiling above bathtub 45.00
Total $2,902.33
Plus plumbing fixtures as described above 283.63
Total $3,185.96
We will disallow the following items for the following reasons:
The white concrete mix for the outside steps — Crescent claims $30.00 for this extra. However, Mr. Dahlman admitted that Mrs. Monteleone gave him $30.00 to pay for the mix. At first Mr. Dahlman claimed the cost of the mix was $60.00 but later on in his testimony admitted it was only $30.00.
Extra lighting fixtures and relocation of two hall lights — $189.67 for these two items. However, there was a lighting fix *314 ture allowance in the contract for $250.00 and Mr. Dahlman was unable to testify as to the total amount spent on lighting fixtures for the home. Therefore these extras have not been proven.
Louvered doors — $85.00. Mr. Dahlman testified that Mrs. Monteleone decided she would like to have louvered doors on the second floor instead of hollow birch flush doors called for in the plans and specifications. However, Crescent did not prove by documentary evidence the difference between the price of the two different type doors.
Redesign of front steps — Crescent claims $266.00 for curving the steps to come out at a right angle instead of building them to go straight up and down. However, Mrs. Monteleone testified she did not request or authorize the redesign of the steps and we do not find the trial court committed manifest error in believing her.
Larger windows — although Crescent claims $135.00 for increasing the size of certain windows, it produced no evidence concerning how much larger the windows installed were than those provided for in the plans and specifications.
Circular driveway — although Crescent claimed $210.00 for making the driveway wider than that provided for in the plans and specifications, Mr. Dahlman was unable to testify just how much larger he made the driveway.
Lot fill — $742.48. The specifications provide that the contractor fill the lot to “rough grade.” There is nothing in the record to indicate that it did any more than was required.
Next we will consider the appeal of Mrs. Monteleone for whom two architects, Mr. Albert J. Wolf, Jr. and Mr. Mortimer Fav-rot, and one contractor, Mr. Adam Klouatre, Jr. testified. When asked if the Monteleone home were constructed in a proper and first class manner, Mr. Wolf answered, “No.” Mr. Favrot described the work as “below standard.” Their views were corroborated by that of the trial judge who personally inspected the home and described the workmanship as generally poor and below standard.
Mr. Klouatre gave estimates for repairing the defects in construction and departures from the plans and specifications, most of which the trial judge accepted. Only one item which was disallowed is contested on appeal: $11,860.00 to correct the deviations from the plans and specifications regarding the elevation of the house. The second level which included the foyer and living room was lowered 10-14" below the level provided for in the plans and specifications. Although there was some discrepancy in the opinions of the experts we conclude this deviation necessitated the following changes: Two additional steps or risers in the stair well from the second to the third level, steeper stairs, less room between the entrance to the foyer and the stairway and elimination of a coat closet. Crescent installed an air conditioning unit in the space which was left in the coat closet after the stairway was installed. Mr. Wolf testified this would make the servicing of the air conditioning unit difficult. Mr. Klouatre testified that the correction of the elevation defect would mean partial demolition of the house and therefore would cost the $11,860.00 referred to above. He admitted however that the deviation did not harm the home structurally. Thus the evidence shows that the lowering of the level of the house resulted solely in inconvenience and loss of aesthetic value, but these are damages for which Mrs. Monteleone should be compensated under LSA-C.C. art. 1934 which provides inter alia:
“3. Although the general rule is, that damages are the amount of the loss the creditor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether the pecuniary loss, or the privation of pecuniary gain to the party. Where the contract has for its object the gratification of some intellectual enjoyment, *315 whether in religion, morality or taste, or some convenience or other legal gratification, although these are not appreciated in money by the parties, yet damages are due for their breach; * *
Although we do not believe that justice would be served by a large-scale demolition of the house to correct the defect described, we do hold that under the above quoted article Mrs. Monteleone is entitled to damages for this defect for which we will allow $3,500.00.
Mr. Dahlman contends the other repairs can be made for considerably less than the $4,155.50 allowed by the trial court. However, because the two architects and the trial judge agreed that his workmanship was poor, we will not consider his estimates nor will we disturb the award.
The appeal by General Guaranty is limited to one issue, i. e., whether it is entitled to affirmative relief against Mrs. Monteleone because she made the fourth payment of $7,943.00 prematurely. The contract provided that this payment was to be made only when the building and all the work was finished, delivered and accepted; the acceptance to be in writing. Mrs. Mon-teleone admitted she made the payment at a time when she was dissatisfied with the construction and did refuse to give her written acceptance. The payment by Mrs. Monte-leone did prejudice General Guaranty, because Mr. Dahlman admitted he owed subcontractors $6,771.00 before the payment was made and that he did not make any payment on that amount between the time of receiving the check and the date of the instant litigation. Furthermore, it was stipulated that General Guaranty had already paid Crescent’s subcontractors $3,476.23 at the time of trial. However, we can give General Guaranty no affirmative relief as none is provided by Louisiana law. The applicable statute is LSA-R.S. 9:4806 which provides, inter alia:
“ * * * but as between the surety and the owner, the surety may urge any defense growing out of any violation by the owner changing the contract without the consent of the surety, including the defense that the owner has made anticipated payments, to the extent that the surety is damaged by such violation or anticipated payment.” [emphasis added.]
Therefore General Guaranty is entitled to no affirmative relief and the trial court was correct in rejecting General Guaranty’s re-conventional demand against Mrs. Monte-leone. However, General Guaranty is entitled to a defense to the extent Mrs. Mon-teleone’s claim is asserted against it. Therefore although Crescent will be cast, General Guaranty will not be cast in solido with Crescent as Mrs. Monteleone prayed.
For the above reasons we conclude Mrs. Monteleone is entitled to the following:
For items deleted from the plans and specifications (stipulated) $ 786.00
For repair to construction defects in home 4,155.50
For mistake in elevation 3,500.00
Total $8,441.50
Against this amount Crescent is entitled to the following credit:
For extras not provided for in plans and specifications $3,185.96
For final payment due on contract 3,773.00
Total $6,958.96
*316 Therefore the judgment is reversed in that it is in favor of Cresent City Construction Corporation and against Mrs. Dorothy Monteleone and it is decreed that there be judgment in favor of Mrs. Dorothy Monte-leone and against Cresent City Construction Corporation for $1,482.54. Otherwise the judgment appealed from is affirmed; all parties to pay their own costs on appeal.
Reversed in part and affirmed in part.