393 So.2d 885 (1981)
STATE of Louisiana et al.
v.
WILCO CONSTRUCTION CO., INC. et al.
No. 11490.
Court of Appeal of Louisiana, Fourth Circuit.
January 13, 1981.
*888 State of Louisiana Department of Justice, William J. Guste, Jr., Atty. Gen., Robert E. Redmann, Stephen J. Caire, Asst. Attys. Gen., New Orleans, for plaintiffs-appellees.
Dodge, Friend, Wilson & Spedale, Douglas S. Draper, Gordon F. Wilson, Jr., New Orleans, for defendants-appellants Wilco Const. Co., Inc. and St. Paul Fire and Marine Ins. Co.
Deutsch, Kerrigan & Stiles, Frederick R. Bott, New Orleans, for defendants-appellants Register & Cummings and Associates, Architects.
Before GULOTTA, SCHOTT and SARTAIN, JJ.
GULOTTA, Judge.
The State of Louisiana, through its Capital Outlay Budget Board, brought this action against Wilco Construction Co. (general contractor), St. Paul Fire and Marine Insurance Co. (contractor's surety), and Register and Cummings & Associates Architects, for specific performance and damages resulting from defects in the design and construction of additions to the Orleans Area Vocational Technical School, New Orleans, Louisiana.[1] The matter was referred to a commissioner for hearing and the trial court, after review of his report, awarded the State $20,121.00 against the contractor and its surety, in solido, for various construction defects attributable solely to the contractor,[2] $153,754.00 *889 against the architects for certain design defects,[3] and $4,883.00 against all defendants, in solido, for defects attributable to both the contractor and the architects.[4]
Appealing, the surety contends that it is entitled to a discharge from the judgment to the extent of $10,000.00 because the State, having withheld $15,000.00 of the contract price to insure completion of the defectively constructed roof, prematurely made a $10,000.00 final payment to the contractor without notifying the surety or safeguarding that the contractor would make the promised roof repairs. The architects, also appealing, contend that they should be held liable for only the cost of repairing the defectively designed east and west walls of the building instead of the cost of demolishing and replacing them as awarded by the trial court. In answer to these appeals, however, the State significantly expands the scope of our review by specifying nine alleged errors in the judgment.[5] Before turning to the merits of these contentions, however, a brief chronology is in order.
A contract between the Capital Outlay Budget Board and Register and Cummings, the defendant architects, was signed on November 20, 1969 and the architects' fee was set at 6.25% of the contract price. The contract between the Board and Wilco Construction Co. was signed on May 5, 1971 for a price of $428,000.00. According to the original agreement, the contractor was to begin work on May 20, 1971 and the project was set for completion on January 24, 1972. The State approved various change orders, however, and a new completion date was set for January 20, 1973. After inspecting the work, the architects informed the State on January 24, 1973 that the construction was "substantially complete" in accordance with the contract and ready for occupancy. At that time, the State retained over $40,000.00 of the contract price. On February 15, 1973, the State informed the contractor that the project had been accepted as complete with the exception of a brief punch list. In March, 1973, a portion of the roof was blown off by a storm. The State made temporary roof repairs in April, 1973, and in May State officials met and corresponded with the contractor and the architect to discuss the roof problem and other deficiencies in the structure. On May 30, 1973, after the contractor's request for final payment, the architects proposed that $15,000.00 be retained to cover roof repairs and other deficiencies in the construction. Shortly thereafter the State made final payment to the contractor except for this $15,000.00 retainage. The State claims that it occupied the building on October 1, 1973. On November 16, 1973 another $10,000.00 payment was made to the contractor upon *890 its promise to repair the roof. The contractor made no such repairs, however, and the State filed suit against it and the architects on May 3, 1974. Roof repairs were made in October, 1976 at the State's expense. The State continued to occupy the building until June 10, 1977, when the City of New Orleans found it "in serious structural condition" and recommended that it be "evacuated" immediately.

PRO TANTO DISCHARGE OF SURETY
We consider first the surety's contention that because $10,000.00 was released prematurely to the contractor without notice to the surety, it should be exonerated from liability for that part of the judgment rendered against the contractor. In support of its argument, the surety cites LSA-C.C. Art. 3061,[6] and private works construction cases holding that the premature release of retainage by an owner without safeguards insuring performance operates as a release to the surety pro tanto.[7] We agree.
The record indicates that on November 16, 1973 the state released the $10,000.00 payment to the contractor without notifying the architect or the surety. The State's then chief engineer, Fred Bell, Jr., whose job was to examine state projects to make sure the work was properly done, testified that he had released the $10,000.00 upon the contractor's letter stating that it would install a blown-off section of the roof, repair blisters in the roof surface, and work with pitch pockets to bring the roof to contract specifications. This witness testified that he had not contacted the architect or the surety before release of the $10,000.00 and did not know if the surety had any knowledge of the payment. Bell testified that he had felt that retaining the final $5,000.00 of the contract price would cover the work required of the general contractor. As the evidence indicates, however, the entire roof must be replaced at a cost of $13,500.00. Accordingly, we conclude the retainage was released without notice to the surety and that this oversight has resulted in prejudice to it. We believe that it is precisely this situation that is contemplated by the codal article and the cited jurisprudence. Accordingly, we conclude that the surety is entitled to a $10,000.00 release from its ultimate liability to the State.
In so holding, we reject the State's contention that LSA-R.S. 38:2241, which provides in part:
"No modification, omission, additions in or to the terms of the contract, in the plans or specifications or in the manner and mode of payment shall in any manner affect the obligation of the surety."
considerably broadens in public works contracts, the scope of a surety's responsibility to such an extent that the surety would be liable even though the contract had been modified without the surety's consent. We are of the view that the cited language of the revised statute dealing with public works contracts contemplates the surety's liability to third parties to the building contract, such as laborers, material men and sub-contractors, and not liability of the surety to the owner under the circumstances of the instant case. As pointed out by counsel for the surety, the statutory interpretation offered by the state and subscribed to by the commissioner, would effectively make LSA-C.C. Art. 3061 nugatory and would strip protection from the surety when the owner acts to the surety's prejudice without its knowledge. We do not think the Legislature intended such a result.
Furthermore, the contract between the State and the contractor provides that the State shall retain 10% of each progress payment and that payments are to be based *891 upon completed work in progress rather than work to be performed. Moreover, the specifications for the project provide that when objectionable grounds are removed, payments shall be made for amounts withheld. The objectionable grounds (the roof repair and other defects) were not removed but only promised to be removed when the premature $10,000.00 payment was made to the contractor. Under these circumstances we conclude the surety is entitled to a pro tanto release in the amount of the retainage prematurely paid to the contractor. The contractual provision that alterations in the agreement shall not release the surety from liability has no effect as between the State and the surety under our circumstances, and does not preclude the release provided by law. See Fort Worth Independent School District v. Aetna, 48 F.2d 1 (5th Cir. 1932); Fidelity and Deposit Company of Maryland v. Claiborne Parish School Board, 35 F.2d 376 (5th Cir. 1929); 17 Am. Jur.2d, Contractor's Bonds, § 103.

EAST AND WEST WALLS
The Commissioner awarded $148,568.00 for the cost of replacing the east and west walls. The defendant architects contend, however, that the award is erroneous since the walls could be repaired and need not be entirely demolished and replaced. According to the architects, an adequate repair would cost $39,206.00, as estimated by their experts. Citing several established cases as authority,[8] the architects argue the repair cost is the proper measure of damages. The architects claim that the State has not met its burden of proving that replacement is necessary since the State's experts admitted (under cross examination) that the east and west walls of the structure were salvageable and since the State did not introduce any testimony concerning the cost of repair. Only in those cases where the object cannot be adequately repaired or the cost of repair exceeds the value of the object damaged, the architects argue, can the State be entitled to the cost of replacement.
While we do not quarrel with the authorities cited by the architect, we conclude that they do not apply to our case since the record supports the Commissioner's finding that the east and west walls are irremediably defective.
The east and west weight-bearing masonry walls of the building are 165 feet long. The defendant architects concede that the walls are defectively designed in that the vertical forces bearing down on them are transferred to the narrow "piers" or spaces between the windows of the structure. These piers of concrete block are overstressed far in excess of the allowable limits in the New Orleans Building Code. It is also undisputed that the walls do not meet code requirements as to horizontal forces or "wind load".
At trial, two experts presented remedial solutions to the design problem of the walls. H. J. Bergeron, Jr., an expert architectural engineer called by the surety, suggested filling the "cells" or open spaces of the concrete blocks to have them act as columns and installing steel tubes or "stub" columns in the windows in order to distribute the vertical load. He stated that his proposal was not a final design but "an idea." Another expert, Donald C. Makofsky, a civil engineer called by the defendant architects, proposed inserts to the windows that would be jacked into place and would carry the forces down the wall. According to this expert, in this way the vertical over-load would be reduced to acceptable limits. He would reduce the horizontal "wind load" by designing a steel tie frame of wall braces that would allow the building to withstand horizontal forces. Makofsky stated that his solution was satisfactory from an engineering standpoint, but would not certify his proposal as complying with the New Orleans Building Code. He also indicated his proposal was a "general idea" and that it would be necessary that a design team be engaged to work out the details before a contractor could implement them.
*892 The State's experts, Frank J. Dalia and Ashby T. Gibbons, Jr., rejected the proposed repair solutions. Dalia, a consulting engineer, testified that neither proposal individually nor a combination of the two would bring the walls into conformity with the New Orleans Building Code and that the existing forces would exceed by 15% to 25% the allowable limits. This witness conceded on cross examination, however, that the walls could be salvaged. He stated that he could explore an extension of the two proposed solutions, especially Makofsky's, and that other possibilities existed. He had no idea what a remedial solution would cost.
Gibbons, the State's other expert, also felt that the proposed solutions would not provide safety or conform the walls to code requirements, but noted that Makofsky's solution was adequate to take care of the wind load factor only. Concerning Dalia's comments on the extension of Makofsky's solution, Gibbons noted that care would have to be taken in detailing it. He observed that although a remedial solution is possible, it will not be simple to make an "under-designed" wall conform in every way to the building code. He could not answer if complicated fixing of the present walls would be cheaper than tearing them down. Furthermore, Gibbons stated that although he had been asked about repairing the walls, he had refused to come up with the cost of any remedy short of tearing the walls down because he would have had to consider a number of factors and every aspect of the building for solution. He remarked that he could not do such a thing without receiving compensation and being asked to "redesign" the building.
Well settled is the rule that expert testimony is to be weighed by the trier of fact like any other non-expert testimony. McCarstle v. McCarstle, 356 So.2d 491 (La. App. 1st Cir., 1977); Smith v. Andrepont, 378 So.2d 479 (La.App. 1st Cir., 1979), writ denied, 380 So.2d 102 (La.1980). Where the testimony of expert witnesses differs, it is largely a matter of fact for the trier of fact to determine the most credible evidence. St. Pierre v. Gabel, 351 So.2d 821 (La.App. 1st Cir. 1977). The purpose of expert testimony is to assist the court in making factual determinations and the opinions of experts are not conclusive, but are to be weighed as is other evidence. Bonilla v. Arrow Food Distributors, Inc., 202 So.2d 438 (La.App. 4th Cir. 1967), writ refused, 251 La. 399, 204 So.2d 577 (1967).
The structural problems presented by the defective design of the east and west walls are not easily solved. The Commissioner presided over a "battle of the experts" and we cannot say he was clearly wrong in rejecting the solutions proposed by Bergeron and Makofsky and relying on the opinions of Dalia and Gibbons. Although these latter experts admitted the possibility of a remedy short of demolishing and rebuilding the walls, they both envisioned great difficulties in any possible solution. A fair reading of Gibbons' comments is that a possible solution involves redesign of the entire building. Even Makofsky and Bergeron's solutions involved "design" of the walls. A reasonable inference may be drawn from Gibbons' testimony that "repair" of these walls, even if theoretically possible, is not practical in this case.
Although the cases cited by the architects speak of the cost of repair as the measure of damages, such measure is not adequate in our case. It must be borne in mind that the defect in these walls is one of design and the so-called "repair" of this "under-designed" wall affects the design of the entire building. None of the cited cases involves redesign of the magnitude called for in our case. As stated in Graeme Spring & Brake Service v. De Felice, 98 So.2d 314 (Orl.App., 1957), the word "repair" contemplates "an existing structure or thing that has become imperfect, and means to supply in the original existing structure that which is lost or destroyed and thereby restore it to the condition in which it originally existed as near as may be." Ours is not a case where some component of an adequately designed structure has been left out or inadequately installed, or where an improper design is susceptible to a reasonably workable remedy. The *893 "fix" or "repair" in our case involves a significant design change. Even accepting the fix as suggested by Makofsky and Bergeron, the weight-bearing load would be substantially in excess of the acceptable maximum limits as allowed in the building code of the City of New Orleans. The concern is one of safety and it is of no moment that state projects are not subject to local municipal building code requirements. Accordingly, we cannot say the Commissioner's conclusion that the walls must be replaced rather than repaired is clearly wrong.

ERROR IN COMPUTING COST OF REPLACING EAST AND WEST WALLS
In computing the cost of demolishing and replacing the east and west walls, the Commissioner relied on estimates prepared by the State's expert, James R. Smith, whose figures for various aspects of the demolition and reconstruction of various parts of the building were included in his report introduced into evidence. Some of Smith's figures were accepted at 100% since they related entirely to the east and west walls. Other figures in the exhibit were taken at 74% of their value since the total figures included demolition of all four walls and required reduction to the square footage involved in the demolition of the two east and west weight-bearing walls.[9]
Although the State does not argue with the Commissioner's treatment of those figures in computing the award, it contends that he neglected to include Smith's figures for "masonry equipment allowance", construction and removal of "temporary walls", "acoustical tile", and other expenses relating to plumbing, heating and electrical work required by the reconstruction of the walls.
We decline to amend the judgment to allow increases for masonry equipment allowance or temporary walls. There is no evidence in the record to indicate that the estimated cost of these items is related to the east and west walls. Accordingly, we cannot say the Commissioner erred in neglecting to include them in his assessment of damages. On the other hand, the Commissioner made allowance for removal of acoustics in connection with demolition of the walls, but no allowance for replacement of acoustical tile, a separate item also listed in Smith's itemization. Also omitted by the Commissioner and the trial judge, were costs, as itemized by Smith in his testimony at trial, for plumbing, heating and electrical work. According to Smith, replacement of the exterior walls will require that light fixtures, ducts and plumbing be removed. We conclude that failure to include these costs for acoustical tile and the items related to the plumbing, heating and electrical work was error. Accordingly, an increase in the State's award is warranted for these items as follows:

Item on Amount
Smith's of
Report Description Award
9-A ACOUSTICAL TILE $ 1,653.00
15-A PLUMBING (necessary to accommodate
 (.74 × $4,000) shoring) 2,960.00
15-B H.V.A.C. (necessary to accommodate
 (.74 × $10,000) shoring) 7,400.00
16-A ELECTRICAL (necessary to accommodate
 (.74 × $6,000) shoring) 4,440.00
 __________
 TOTAL $16,453.00

We conclude, therefore, that the award against the architect for replacement and reconstruction of the east and west walls should be increased by $16,453.00.

ARCHITECT'S FEES
In computing the award for replacement of the east and west walls of the building, the Commissioner allowed 6¼% as an architectural fee for redesign of the wall.[10] This *894 percentage is the same as that specified in the original contract between the Capital Outlay Budget Board and the defendant contractor.
We agree with the State that the 6¼% allowance is contrary to the evidence presented. Lee Connell, the State's expert, used an architect's fee of 15% in estimating replacement costs in his report for various deficiencies in the building. In his testimony at trial, however, he conceded that fees are generally closer to 10%, but that the work presented by this case did not involve standard remodeling and deserved a higher fee. Stanley W. Muller, the surety's architectural expert, testified that although an architectural fee for new work is about 6%, a reasonable fee to undertake the job that Connell called for in his report would be 10%. In light of this testimony, we conclude that an architect's fee of 10% should have been applied in assessing the cost of remodeling and reconstructing this building.
The sub-total of the Commissioner's computation of the cost to replace the east and west walls was $139,829.00. Because we have increased that amount by $16,453.00 to make allowances for the Commissioner's error in computation, we arrive at a new sub-total of cost of replacement of $156,282.00. We therefore compute the architect's fee at 10% of this sub-total and arrive at the figure of $15,628.00 instead of the $8,739.00 award for architect's fees allowed by the Commissioner. In short, we conclude that the award for the architect's fee in connection with replacement of the east and west walls should be further increased by $6,889.00.

NORTH AND SOUTH WALLS
The non-weight-bearing north and south walls of the building are approximately fifty feet long. The north wall has no openings and the south wall has only one window. The Commissioner recommended no allowance for these walls, although he found that they had been defectively designed in lacking expansion joints to control cracking. He concluded that this design defect was not of sufficient import to require demolition of the walls. He further found that although the walls contained cracks, they were not greater than 1/16 of an inch and that an elastic membrane that had been installed between the concrete block and the exterior brick veneer could bridge such cracks in the masonry and still preserve the waterproof integrity of the building. He further found that there had been no showing that the "duro wall", a horizontal joint reinforcement tying the brick veneer to the concrete block wall, had been improperly applied.
The State contends that the judgment was erroneous in disallowing the cost of demolishing and constructing the north and south walls. It argues that the duro wall has not been properly installed, that "through-wall" flashing has not been installed at all horizontal breaks in the north and south wall, that moisture was coming through the elastic membrane between the brick and the concrete, that serious cracks exist in the north and south walls, and that the walls, as designed, do not meet the standards of practice concerning wind load.
Our examination of the record leads us to conclude that the Commissioner's disallowance of cost for demolishing and reconstructing the north and south walls in their entirety is supported by the testimony of defendants' experts. We further conclude, however, that some allowance for a remedial solution to the wind load problems should have been made.
Concerning the horizontal joint reinforcement known as duro wall, Lee Connell, the State's expert, was of the opinion that this material had not been properly installed. He reached his opinion after selectively probing for the reinforcement in the south wall with a masonry drill and finding that the bit did not strike the reinforcement as would be expected in a proper installation. He did not recall making any probes in the north wall. Connell's method of analysis was disputed, however, by L. D. Oliver, the surety's expert, who said that such probing was not a proper means of determining the existence of the duro wall. He was of the *895 opinion that it was installed. Given this conflict in the testimony, we cannot say that the Commissioner erred in accepting Oliver's testimony concerning this aspect of the construction.
"Through wall" flashing and an elastic waterproofing membrane over the masonry block were discussed by several experts. Connell cited the problem of a lack of through wall flashing as impairing the weather tightness of the building. He indicated that the plans show flashing only on the first and second floors at entry port holes, that the window detail shows "head" flashing over the windows, and that flashing was not specifically required elsewhere in the plans. Nevertheless, he felt that a provision in the specifications that sheet metal should be provided where indicated at all other places required to prevent entry of water should be interpreted to mean that flashing was required in other places than those indicated in the plans. Stanley Muller, an architectural engineer called by the State, indicated that through wall flashing can be metal or plastic or a nylon membrane and that flashing is on top of doors and windows. He indicated that the elastic backup installed between the masonry block and the brick veneer could serve the same purpose as through wall flashing and he saw nothing in the plans requiring that through wall flashing be installed.
Richard Smith, the defendant architect, testified that he did not think through wall flashing was required by the plans and specifications and that the elastic bond coating performed the same function. Oliver, the surety's expert, testified that through wall flashing was not required since the membrane flashing was comparable and performed the same function. Joseph T. Fulco, the architects' expert, testified that waterproofing elastic takes the place of through wall flashing.
In light of this testimony, the Commissioner could conclude that through wall flashing was not required. Furthermore, since the north and south walls have only one opening, any flashing requirement concerning windows and doors was virtually irrelevant. Accordingly, we find no error with the trial court's conclusion that no problem existed regarding through wall flashing in the north and south walls.
Although conceding the existence of the elastic backup in the north and south walls, the State contends that the backing was improperly applied and that water is entering the building through the wall. Connell testified that he had removed brick from the east and west walls and had found voids in the elastic backing causing it to malfunction. It was his opinion that water was coming from the outside through the elastic backup and down the inside of the south wall. He did not remove bricks at all locations where there was cracking on the walls, however, and did not see where the elastic backup was unable to withstand such cracks.
On the other hand, Edmon Mapp, an expert whose company had applied the elastic waterproofing to the walls in question, stated that the application had been done in a workmanlike manner according to the specifications for damp proofing the concrete block. To his knowledge, there had been no problem with the surface of the masonry when the elastic was applied, although he stated that a cracking wall could damage the elastic backing and destroy its effectiveness if the cracks exceeded 1/16" in width. Gibbons, the State's expert, testified that there were cracks up to 1/16" in width and that, in his opinion, the building was going to continue to move.
Although Frank J. Dalia, another expert, found moisture in the north wall, Fulco, the architects' expert, testified that there were only minute cracks in the north wall and saw no evidence of moisture there. He felt that the south wall, although cracked, was structurally sound and noted further that cracking may have resulted when water came in through the exposed roof deck and froze. Fulco stated that the elastic backing could expand a 1/8" or ¼" crack and not break.
In resolving these differences in expert testimony, the Commissioner was justified in concluding that the State had failed to *896 prove that moisture inside the building had resulted from malfunctioning in the elastic membrane. The storm damaged roof and water on the balcony are plausible reasons for the moisture problem.
Gibbons, the State's expert, was of the opinion that cracking of the north and south walls had resulted from a failure to include expansion control joints. Although he stated that it was still feasible to add control joints to the existing wall, there is no evidence in the record to indicate the cost of these additions. Since the cracks do not affect the structural soundness of the building and the evidence supports a conclusion that they have not damaged the elastic membrane, we cannot say the Commissioner erred in failing to require demolition and replacement of the north and south walls.
Gibbons further testified that the walls of the existing structure do not meet the wind load requirements of the New Orleans Building Code. He noted, however, that Makofsky's proposed solution of interior support or "wind beams" would solve the wind load deficiency. In view of this undisputed testimony, we are of the opinion that the Commissioner should have made an allowance for correction of the wind load problem on the north and south walls. Arthur L. Dahlman, an expert contractor and estimator engaged by the defendant architects, testified that it would cost $12,508.00 to install 56 wind beams for the four walls. Makofsky stated that 16 wind beams would be necessary to brace the north and south walls. Accordingly, we calculate the cost of each wind beam to be $223.36. We conclude, therefore, that the State is entitled to an increase against the architects of $3,573.76 as the cost to install these wind beams on the north and south walls.

SUBSTITUTION OF PAINTED STEEL FOR GALVANIZED STEEL
The Commissioner noted that the plans and specifications called for handrailings to be made out of galvanized steel, but that a substitution to painted steel was made. In view of evidence that there was rust at the joining surfaces of the handrailings and that the rails were too high, the court allowed remedial work at a cost of $1,540.00, attributable to both the architect and the contractor, to adjust the height of the rails, clean the sleeves, and apply a coating to preserve the material for an extended time. The State contends, however, that the allowance of the substitution of materials and the remedial work by the trial court is arbitrary. According to the State, the contract provided for galvanized handrails and stairs, an unauthorized substitution was made, and the State is entitled to recover the $11,553.00 demolition and replacement cost.
Although the evidence is somewhat conflicting, the testimony of the experts clearly indicates that galvanized steel is superior to painted black steel in resisting rust. However, Roger J. Bligh, an employee of the sub-contractor for steel works on the construction job, testified that painted handrails should last as long as the building. This witness stated that the original galvanized specifications were changed to black steel since the configuration of the stairs required field welding of the galvanized pipe and might have impaired the integrity of the galvanization. He estimated a $100.00 to $250.00 difference in price between painted and galvanized handrails. Under these circumstances, we cannot say that the Commissioner erred in allowing remedial work to eliminate the rust problem rather than replacing all the handrails. Nevertheless, because the State paid for galvanized rails, but did not receive them, we conclude that it is entitled to a $250.00 credit payable by the contractor.

HARDWARE
The court made no allowance or mention of various hardware deficiencies, which included missing mutes (small rubber discs on doors), door stops and hinges. Connell, the State's expert, estimated their replacement cost at $4,802.00. Arthur L. Dahlman, the architect's expert contractor and estimator, assessed it at $2,566.00. Although various items of hardware were missing or not *897 working properly, we find no error in the trial court's failure to award the State a hardware allowance.
It is well settled that where an owner proves the existence of defects or omissions and the cost of repairing them, he is nevertheless barred from recovering those costs if he accepted the work despite the patent defects or imperfections discoverable upon reasonable inspection. Despite acceptance, however, an owner may recover for defects not readily discoverable by ordinary inspection or for defects that manifest themselves subsequent to the acceptance or for defects that are reasonably excluded from the terms of the acceptance. Maloney v. Oak Builders, Inc., 224 So.2d 161 (La.App. 4th Cir., 1969); Justiss-Mears Oil Company v. Pennington, 132 So.2d 700 (La. App. 1st Cir. 1961).
Because the State failed to discover the hardware defects prior to final acceptance, there exists no entitlement to a hardware allowance. Dahlman, the architects' expert, testified that hardware is "caught" on a final inspection of the building, presumably before final acceptance. Connell also indicated that hardware is typically one of those things noted on the final inspection. Unfortunately, in our case the State accepted the building in February, 1973, subject to a brief punch list that did not include hardware, except for a notation to "repair door closer" in one specified room. A May 18, 1973 letter from the architects to the State indicates that some "finish" hardware items "particularly butts and hinges do not appear to be those specified." Obviously, the hardware deficiencies were not caught in our case until long after final acceptance. Under these circumstances, the State is barred from recovery.

TEMPORARY ROOF REPAIRS
The trial court awarded $13,500.00 against the contractor for the cost of removing and replacing the roof with remedial work necessary to fasten flashing around the perimeter of the roof, but made no mention of, or allowance for, expense incurred by the State in making temporary repairs to the roof prior to trial. He further gave a $5,000.00 credit to the contractor for the amount of the purchase price retained by the State.
The State argues that the contractor should not be allowed to receive the $5,000.00 credit since substantial performance has not been proven; and that it is entitled additionally to $2,659.00 for the cost of temporary roof repairs and also an award of $3,467.00 for the cost of demolishing the existing roof.
At the outset, we reject the State's argument concerning the credit in favor of the contractor. It is clear that $5,000.00 of the contract price was withheld by the State and that the contractor substantially performed the work. Admittedly, the record indicates that such performance was deficient in several respects, but it is also clear that the State accepted the building as substantially complete, paid the contractor all but a fraction of the total contract price, and occupied the building until it was vacated because of a design defect. Under such circumstances, we cannot say that the contractor must be denied credit in the amount of the retainage.
We likewise find no merit to the State's claim for additional costs of roof demolition including removal of downspouts, gutters, gravel stop, roofing and backing. The State's expert, Connell, estimated the cost of replacing the built-up roofing and sheet metal at $13,962.00. This figure included the cost of removing the roofing, the gutters, and the downspouts. The trial court's award of $13,500.00 reasonably approximates Connell's estimate of $13,962.00 which includes the architect's fee. Accordingly, we conclude the State is not entitled to any additional demolition costs.
We are of the opinion, however, that the State is entitled to an increase of $2,659.00 for its expense in October, 1976 in repairing a section of the roof blown off in March, 1973. Connell testified that the roof came apart because it was improperly nailed. Donald Cook, district manager of a roofing manufacturer, testified that the *898 roof was not tied down as tight as it should have been and that the lack of nails may have had something to do with its raising in the storm. Stanley Muller, another of the State's experts, testified the probability of the lifting of the corner of the roof was high since the gravel guard was nailed to the light-weight concrete. Furthermore, the repair invoice supporting the State's expenditure of $2,659.00 for the repair is part of the record and the roofer who made these repairs testified at trial. Accordingly, we conclude that the damage to the roof resulted from the contractor's defective workmanship and that the cost of repair was proved in the case. The State is entitled to an additional increase in the sum of $2,659.00. This amount is chargeable against the contractor.

CHAIR CARRIERS IN RESTROOMS
As designed, the lavatories in the bathrooms of the building were wall mounted rather than being installed with "chair carriers", metal assemblies hinged on the wall to mount plumbing fixtures. Because fixtures mounted in chair carriers tend to be more secure and because a number of installed lavatories had been broken or pulled loose from the walls by students, the State contends that the architects were at fault in not designing chair carriers into the structure instead of using wall mount brackets unsuitable for the high-abuse school structure. The State argues it should receive a $5,937.00 award against the architect. We disagree.
Richard Smith of the defendant architects testified that a school building does not ordinarily require the added secure mounts accomplished by the use of chair carriers. He indicated that chair carriers would involve a needless expenditure and a greater space. L. D. Oliver, the surety's expert, testified that acceptable design procedure does not require chair carriers be used for lavatories. He stated that he possibly would have used chair carriers had he designed the building, but may not have if it were too expensive. Joseph T. Fulco, the architects' expert, also indicated that wallhung lavatories are acceptable in schools. Joseph D. Savwoir, assistant director of the school, indicated that lavatories fastened with wall brackets had been broken by students in other buildings in the school. In view of this testimony, we cannot say the trial court erred in failing to find the absence of chair carriers a design defect.

LIQUIDATED DAMAGES
No award was made to the State for liquidated damages. The agreement between the State and the contractor relating to liquidated damages provides:
"If the work is not completed in every respect within the time specified for completion, or within the time as it may be extended as provided in the specifications, it is distinctly understood and agreed that there shall be due the Owner by the Contractor, as liquidated damages, the sum of $200.00 per day for each and every day after the date fixed for the completion of the work that the said work shall remain unfinished; ...."
The State argues that it is entitled to $14,800.00 in liquidated damages for seventyfour days extension for completion of the construction that were allegedly granted "in error" and $51,000.00 for two-hundredfifty-five days from February 19, 1973 (the date the State accepted the project as being completed upon recommendation of the architect, subject to the punch list) to October 1, 1973 (the date the State allegedly occupied the building.) According to the State, although it had accepted the project as complete, it discovered deficiencies in the roof and was justified in not taking occupancy until October 1st.
At the outset, we reject the argument concerning the time extensions allegedly granted in error. Although the State argues that seventy-four extra days for completion of the contract were granted in error, no testimony or evidence was introduced to prove the nature of this error. Erroneous extensions are discussed in Connell's report and the defendant architects' inspection reports were proffered to show that some of the change orders were issued *899 in error, but there is no explanation why the State, despite these alleged errors, still signed the change orders extending the completion date to January 20, 1973. These change orders were introduced and we find no reason to dispute their validity.
Turning now to the State's claim for liquidated damages from February to October, 1973, we find no merit to the State's contention. Our courts have awarded damages for demurrage to an owner on a per diem basis from the time the building was to have been completed under the contract until the time the owner obtained possession of it where the building was not completed in substantial compliance with the contract when the contractor tendered it to the owner. Wilson v. Peak, 210 La. 969, 28 So.2d 677 (1946). Nevertheless, where a contractor has not completed the work called for in a building contract or where he has performed such work in a defective manner, but there has been substantial performance, the owner's right to collect damages in the form of demurrage ends upon substantial performance and tender. Elite Homes, Inc. v. Herrmann, 242 So.2d 614 (La.App. 4th Cir. 1970), writ denied, 257 La. 984, 244 So.2d 857 (1971). The record supports a conclusion that the building had been "substantially" completed and was tendered and available for occupancy in January, 1973.
In a letter of January 24, 1973 from the architects to the director of the Capital Outlay Board, the architect confirmed that the contractor had in fact completed the work in accordance with the plans and that the construction was substantially complete on January 20, 1973 in accordance with the contract. The architect recommended acceptance of the project as "substantially complete ready for user occupancy." A list of "clean-up items" that needed attention prior to final acceptance but did not hinder occupancy was attached to this letter.
On February 13, 1973 the Capital Outlay Budget Board by motion recommended that the project be accepted as complete and placed in the 45-day lien period, subject to the punch list. On February 15, 1973 the State wrote a letter to the contractor and informed him that the Board had accepted the project as complete and enclosed a Notice of Acceptance to be filed with the clerk of court. That notice was filed on February 19, 1973.
In March, 1973, a portion of the roof was blown off by a storm, but the State made temporary repairs in April, 1973. On April 3, 1973 the State sent a letter to the architect and listed ten building deficiencies as of March 23, 1973. These deficiencies included the absence of landfill, unlevel floors, water in the restrooms, water seepage into the ground floor of the building, rusting restroom doors, the absence of thresholds, water in the second-floor restrooms because of the roof leak, a broken mirror, leaking through an upstairs rear window, defective doors on the roof air condition and heating cabinets, and the roof damage caused by the storm.
A series of meetings and correspondence between the owner and the contractor ensued in an attempt to resolve these problems. On May 30, 1973 the architect recommended to the State that it release the contractor's final payment and retain $15,000.00 in light of the roofing problems and various omissions subsequently discovered on the project. The State did in fact make a final payment to the contractor except for the $15,000.00 retention in June, 1973.
Under these circumstances, we cannot say that the building was not substantially complete by the extended contract date for completion. Although there were problems with the roof and certain other defects in the building, there was no awareness (in January and February, 1973) of the structural defects in the weight-bearing walls that ultimately led to the necessity to vacate the building. Moreover, the testimony is confusing as to the date the State actually occupied the building. Joseph D. Savwoir, assistant director of the vocational school at the time in question, initially testified that he had occupied the building in February, but later stated that he had moved into the building in October, 1973. Considering this evidence, we cannot say *900 that the building was not substantially complete. The State accepted it as complete upon the architect's recommendation. The State indeed could have occupied the building after acceptance. Under these circumstances we cannot say the trial judge erred in not awarding liquidated damages to the State.

DAMAGES FOR INCONVENIENCE AND LOSS OF USE
The building was vacated in June, 1977 after the City of New Orleans found structural defects and concluded the building should be no longer occupied. Claiming entitlement to damages for inconvenience caused by loss of use, the State argues that a proper measure of damages is $200.00 a day for a 180-day period.[11]
Although we have been cited no authority for entitlement to damages for inconvenience in construction cases, our research indicates that a reasonable argument can be made suggesting entitlement to this item of damages.[12] We do not pass on this question however, because of the State's failure to establish the nature of the State's inconvenience or the expenses occasioned by the loss of use. Confronted with this lack of proof, we cannot simply take the $200.00 per day liquidated damage figure in the contract between the State and the contractor and apply it as the measure of damages in a claim by the State against the architects. Accordingly, the State is not entitled to any award against the architects for damage resulting from inconvenience or loss of use of the structure.

RECAPITULATION
Recapitulating, we conclude that plaintiff is entitled to an increase in the $20,121.00 award against the contractor and its surety in an additional amount of $2,909.00, or a total award of $23,030.00. This increase is composed of the following items:

$ 250.00 - Credit payable to the State by the contractor
 for overpayment; substitution of painted
 steel for galvanized steel rails.
 2,659.00 - Temporary roof repairs.
=========
$2,909.00 - TOTAL

We hold, however, that the surety is entitled to be exonerated from the judgment against it to the extent of $10,000.00 as a result of the premature release of the retainage by the State.
Further, plaintiff is entitled to an increase in the $153,754.00 award against the architects in an additional sum of $26,915.76, or a total of $180,669.76. This increase is for the following items:

$16,453.00 - Costs for replacing acoustical tile and expenses
 related to plumbing, heating and
 electrical work necessary to accommodate
 shoring in connection with rebuilding east
 and west walls.
6,889.00 - Use of 10% rather than 6.25% architect's
 fee in calculating costs to rebuild east and
 west walls.
3,573.76 - Cost of installing "wind beams" on north and
 south walls.
========
$26,915.76 - TOTAL

DECREE
Consistent with the foregoing, we amend the judgment of the trial court as follows. The judgment in favor of the State of Louisiana and against Wilco Construction Co., Inc. and St. Paul Fire and Marine Insurance Co., in solido, is increased from $20,121.00 to $23,030.00, with interest from date of judicial demand until paid. The surety, St. Paul Fire and Marine Insurance Co., is exonerated from this award to the extent of $10,000.00.
*901 The judgment in favor of the State of Louisiana and against Register and Cummings & Associates, Architects, is increased from $153,754.00 to $180,669.76, with interest from date of judicial demand until paid.
In all other respects, the judgment is affirmed.
AMENDED, AND AS AMENDED, AFFIRMED.
NOTES
[1] The construction, labeled State Project 11-21-69, included two buildings. Only Building "A", a two-story masonry structure with a brick veneer, is before us on this appeal. Building "B", a metal structure, does not concern us.
[2] The judgment against the contractor and its surety, includes the cost of cleaning the brick exterior of the building, filling voids in the concrete block wall, closing voids between interior walls and the ceiling in certain rooms, installing pipe flanges, a wall louver, stair treads, and a cover plate on the underside of the stairwell, performing remedial work on the ceiling of an exterior walkway, covering bent steel supports, repairing a bolt hole, applying a new roof, installing a damper, miscellaneous painting, and credits for a walkway not constructed and a window not installed. Although these items of damage total $25,121.00, the Commissioner recognized as a credit $5,000.00 of the contract price retained by the State after accepting the building.
[3] The damages attributable to the architect include the cost of demolishing and reconstructing improperly designed east and west walls of the building and sloping an entranceway and second floor balcony walkway.
[4] The judgment against all defendants, in solido, is for the cost of topping concrete sidewalks and a ground level walkway and adjusting the height of certain handrails.
[5] Briefly stated, the errors specified by the State are: the court's disallowance of claims for (1) the cost of demolishing and reconstructing the north and south walls, (2) the cost of replacing painted steel items that were specified to be galvanized, (3) the cost of installing proper hardware, (4) the cost of a temporary repair to the roof, (5) the cost of installation of chair carriers in the bathrooms, (6) liquidated damages, and (7) damages for inconvenience in the loss of the use of the building. The State also contends that the commissioner (8) erroneously calculated the architects' liability as to the east and west walls and (9) used 6.25% as an architect's fee in calculating such liability when the evidence clearly supported the award of a 10% architect's fee in assessing that aspect of the damages.
[6] LSA-C.C. Art. 3061 provides:

"The surety is discharged when by the act of the creditor, the subrogation to his rights, mortgages and privileges can no longer be operated in favor of the surety."
[7] See Talbert v. Bounds & Allen, 123 So.2d 815 (La.App. 2nd Cir., 1960); Walters Air Condition. Co. v. Firemen's Fund Ins. Co., 252 So.2d 919 (La.App. 2nd Cir., 1971); and Crescent City Construction Corp. v. Monteleone, 209 So.2d 311 (La.App. 2nd Cir., 1968).
[8] Nichols Ford Company, Inc. v. Hughes, 292 So.2d 345 (La.App. 2nd Cir., 1974); Stream v. Le Jeune, 352 So.2d 714 (La.App. 3rd Cir., 1977); Davis v. Roberts, 194 So.2d 772 (La. App. 1st Cir., 1967).
[9] The commissioner arrived at the .74 factor by reducing Smith's figures in proportion to the square footage eliminated.
[10] The trial court assessed the total cost to remove and replace the east and west walls at $115,371 to which he added figures for the contractor's overhead, mark-up and bond premium to give a sub-total of $139,829. The architect's fee of $8,739 (6¼% of the sub-total) was added to give a grand total of $148,568 as the cost for demolishing and reconstructing the east and west walls.
[11] The State claims damages for the 60-day period from June 10, 1977 (when the building was vacated) until the end of trial, and for an additional 120 days (the period of 3 to 4 months, as testified by the State's contractor, that will be required to rebuild and repair the structure).
[12] See LSA-C.C. arts. 1934(3), 2762, and 2769. See also, Jack v. Henry, 128 So.2d 62 (La.App. 1st Cir., 1961), which recognized that the owner of a residence was entitled to damages for inconvenience resulting from a contractor's breach of the obligation to construct the residence in a workmanlike manner. See also, Co-operative C. Stor. Bldrs., Inc. v. Arcadia Foods, Inc., 291 So.2d 403 (La.App. 4th Cir., 1974).