483 So.2d 1215 (1986)
CNG PRODUCING COMPANY
v.
SOONER PIPE AND SUPPLY COMPANY, et al.
No. CA-3812.
Court of Appeal of Louisiana, Fourth Circuit.
February 14, 1986.
Rehearing Denied March 19, 1986.
Writ Denied May 16, 1986.
Richard K. Leefe, Partee, Leefe, Waldrip & Roniger, New Orleans, for plaintiff-appellant CNG Producing Co.
Paul V. Cassisa, Sr., Bernard, Cassisa, Saporito & Elliott, Metairie, Sheryl Hopkins, Gordon, Arata, McCollam, Stuart & Duplantis, New Orleans, for defendant-appellee Sooner Pipe & Supply Corp.
Williams A. Porteous, III, Porteous, Hainkel, Johnson & Sarpy, New Orleans, for defendant-appellee The Hydril Co.
Before SCHOTT, BARRY and KLEES, JJ.
BARRY, Judge.
CNG Producing Company appeals an adverse judgment on its claim that Hydril *1216 Corporation sold defective tubing to Sooner Pipe and Supply Corporation which sold the pipe to CNG.[1]
On January 18, 1979 CNG, a company engaged in producing oil and gas, purchased from Sooner 17,760 feet of 2-7/8 inch O.D. 7.9 lb. P-105 B & W seamless tubing with Hydril PH6 threads. The tubing was manufactured by a rolling steel fabricating company and Hydril threaded the box and pin ends and phosphatized the pins. It was then sent to a coating company for inspection and internal coating. The tubing was in Sooner's inventory when CNG placed its order.
The tubing was delivered to Indian Point No. 8 well in CNG's Hell Hole Bayou Field and was strung and placed approximately 16,000 feet into the well head. It was removed without any problem and rerun into the well. A break occurred in the pin end of one of the tubes which caused the remaining pieces to fall. The full string was removed from the well and placed on a barge for inspection by Hydril and AMF Tubescope, an independent inspection company.
The cracked pieces were replaced and the string made a successful trip, despite a sixteen foot fall and abrupt stop which imposed tremendous shock loads on the pins. However, another failure occurred while the tubing was in the derrick. On February 19, 1979 CNG ordered 4,200 feet of tubing to replace the cracked pieces, but the string failed in the well and caused the line to fall in the hole. CNG had to remove the entire line resulting in temporary loss of the well. CNG abandoned all of Sooner's pipe after four similar failures within approximately two weeks.
The cracked tubing, as well as random samples, were sent to Anderson and Son, independent metallurgists, who determined the failures were caused by hydrogen embrittlement of the steel, a process by which hydrogen atoms attack the steel and work into the grains causing the steel to weaken and fail. Free hydrogen atoms need another agent to enter the metal; however, once in, the hydrogen atoms move about freely and concentrate in the areas of highest stress. High temperatures drive the free hydrogen atoms out of the material, thereby protecting it from embrittlement.
All experts agreed that the tubing failed because of hydrogen embrittlement. The issue is the source of the hydrogen. CNG maintains Hydril's phosphatizing process caused a hydrogen attack on the steel tubing resulting in its failure. Hydril denies the hydrogen embrittlement resulted from its phosphating process and claims it was caused by hydrogen sulfide in the well or by carbolic acid in the drilling mud or by the thread lubricant used by NCG.
In reasons for judgment the trial court stated:
This Court has carefully reviewed the testimony of each of the expert witnesses who appeared in this case. While the testimony of plaintiff's witness, Steven C. Anderson, an independent metallurgist, was supportive of plaintiff's position, it fell short of the level of "proof" required of plaintiff. This Court notes with concern that Counsel for plaintiff appeared to rely upon defendant, Hydril, to affirmatively prove that the phosphatizing process did not cause the embrittlement. A glaring example of this posture is plaintiff's assertion "that such evidence of wrongdoing by Babcock & Wilcox (the manufacturer of the tubing) would be in the nature of an affirmative defense....... and neither defendant has carried its burden in this regard". This Court's appreciation of our fundamental law of torts in Louisiana requires plaintiff to establish his or her case by a preponderance of the evidence.

Green v. City of Alexandria, 413 So.2d 321 (La.App. 3rd Cir.1982)
This Court finds that much of the plaintiff's evidence is based on experts' perception *1217 of what might have happened speculation and possibility.
But such speculation and possibility does not satisfy our requirement of a preponderance of the evidence. Proof which establishes only possibility, speculation or unsupported probability does not suffice to establish a claim.

Thibodeaux v. St. Joseph Hospital 276 So.2d 703 (La.App. 1st Cir.1973)
The trial court concluded:
This Court finds as a fact that the plaintiff, CNG Producing Company, has failed to prove by a preponderance of the evidence that the defendant, Hydril, furnished defective pipe to the defendant, Sooner Pipe and Supply Corporation, which sold said pipe to the plaintiff, CNG Producing Company. Moreover, this Court finds that it is more likely than not that carbolic acid and/or hydrogen sulfide found in Well No. 2 and in Well No. 8 (sic) caused the hydrogen embrittlement.
CNG contends it was error for the court to base its decision on possible causes of the tubing failures which were not likely causes. CNG's chemist, with expertise in the field of phosphate coatings, testified that a hydrogen attack on the steel which releases hydrogen atoms possibly causing embrittlement is a necessary part of the phosphatizing process. Although CNG admits that hydrogen sulphide can cause hydrogen embrittlement, there was testimony that in twenty years of drilling at all depths in the same field no hydrogen sulfide had ever been found. CNG's chemist analyzed gas from Well No. 8 and did not find hydrogen sulfide in the well; however, his analysis was performed almost three years after the failures and his tests involved sands above those open at the time of the failures.
CNG maintains hydrogen sulfide in the well would have attacked the entire length of the production tubing, not just the pin ends. It argues that because the pin is encased in the box end of the connecting piece, the hydrogen sulfide would have to go through the box to get to the pin. No failures were found in the box ends or in the regular lengths of pipe, the parts which would have been exposed to hydrogen sulfide had it been present in the well. CNG emphasizes that only the pin ends failed since only the pin ends were subjected to the phosphatizing process.
Hydril presented evidence that hydrogen sulfide caused problems in nearby wells. It also showed that CNG mishandled the tubing which caused overtorquing and "galling out" of the pipe, there was a hydrogen attack by lignal sulfite found in the drilling mud, and carbolic acid and hydrogen sulfide were present in the well. A Hydril manager testified that when the tubing was threaded, some 25,000 joints of pipe were subjected to the phosphatizing process each month at the Harvey facility and there had never been a reported failure of pins other than CNG's claim.
A Senior Vice-President of CNG who supervised construction, drilling and pipeline operations, testified that there had been a carbolic acid problem in the Hell Hole Bayou field which could have caused embrittlement. The tubing string at Well No. 2 had to be replaced because of an acid attack, and Well No. 9 contained carbon dioxide which reacts with water in the well to form carbolic acid.
Steven Anderson, who analyzed the cracked tubing, was told by CNG that there was no source of hydrogen in the well. Based on this assumption he concluded that the hydrogen embrittlement and cracking occurred during, or shortly after the application of the phosphate coating at Hydril. His sodium oxide and x-ray tests, however, proved positive for the presence of iron sulfide and sulphur, products of the chemical reaction between hydrogen sulfide and steel. Neither phosphorous nor zinc, components of the phosphatizing solution, were found in the cracks.
The Hydril Senior Service Representative who inspected the cracked tubing on the barge, testified that he informed CNG that approximately twenty-five percent of the tubing string removed from the well should be rejected due to galling and handling *1218 damage. He also found evidence of severe overtorquing and noticed CNG had used "Jimmy Gray" lubricant rather than the recommended "API Modified" thread lubricant. The lower resistance of "Jimmy Gray" encourages overtorquing and is a ready source of atomic hydrogen.
John Casner, Hydril's manager of engineering responsible for the design and testing of tubular connections, testified that three conditions cause hydrogen embrittlement: a susceptible material such as P-105 tubing, stress, and an environment which causes absorbtion of atomic hydrogen. He noted no stress on the tubing pins during the phosphatizing process and said electronic inspections on the tubing would detect any crack. He stated the sixteen foot fall would have caused a break at any crack, but since it did not crack he concluded the embrittlement occurred after the tubing was removed from the well. He opined that subsequent time intervals, sunshine and heating during plastic coating would have driven off any hydrogen atoms, thus eliminating the phosphate coating as a potential cause of the embrittlement. He was satisfied that the tubing was sound when it entered the well, but it absorbed atomic hydrogen in the well bore. The high temperature of the well, in excess of 300 degrees Fahrenheit, prevented any cracking until the tubing was cooled after removal from the well.
Dr. Russell Kane, an expert metallurgist, testified that in light of Anderson's positive sodium oxide and x-ray tests, he believed there was hydrogen sulfide in the well. He cited examples of hydrogen sulfide in other wells in the area and stated that hydrogen sulfide problems commonly occur where unexpected. He agreed with Casner's opinion that the failures occurred because the pipe was exposed to and charged with atomic hydrogen in the well.
Dr. Kane gave several reasons why the Hydril phosphate process did not cause the cracking. Although the phosphate solution contains an acid, it also has chemicals causing atomic hydrogen to combine and bubble off to the surface, thus preventing hydrogen from entering the steel. There were no stresses applied to the pins during phosphate coating. There were no cracks in the pins when they left the Hydril plant because a crack would have contained chemicals from the phosphate solution. Importantly, the special end area inspection performed on the pipe after it left Hydril would have detected any cracks.
CNG contends that Sooner as the seller, is liable in redhibition and/or warranty under La.C.C. Art. 2531. Sooner responds that the initial purchase of tubing on January 18, 1979 was shipped to CNG on January 31, 1979. Suit was filed February 15, 1980, hence prescription applies under C.C. Art. 2534.
CNG asserts Hydril was an integral part of the manufacturing process since it threaded the pin ends and applied the phosphatizing process. "A manufacturer is no less a manufacturer because his product is composed in part of units manufactured by another." Spillers v. Montgomery Ward & Co., Inc., 294 So.2d 803 (La.1974).
CNG claims damages of $488,279.18 for costs of the initial order and reorder, inspection expenses, trucking and handling, drilling rig downtime and supervisor expense relative to downtime, hydraulic testing and unloading expenses, plus lost income. Sooner was awarded $46,681.74, the purchase price for the second order of tubing which CNG had not paid.
The court reasons specify:
As is indicated hereinabove, with plaintiff's approval or at least an assent, Babcock & Wilcox, were voluntarily released from any liability for purposes of plaintiff's claim urged in this Court. Under these circumstances, it is difficult for this Court to appreciate plaintiff's theory of implied warranty against Hydril, who is but one of several in the chain of manufacturers of the finished product plaintiff purchased from defendant, Sooner. Having concluded that plaintiff's claim is based on several premises which would inevitably lead to an erroneous conclusion, further consideration of *1219 plaintiff's claim based on products liability jurisprudence is not merited.
The court points out there is considerable basis to conclude that hydrogen embrittlement probably came from within the well.
Mr. Anderson suggested that if certain conditions were present, the Hydril solution may have caused the failures; however, no evidence was introduced that those conditions were at Hydril or that cracks existed on departure from Hydril. The court stated:
Mere proof that something is possible is of little probative value as to an ultimate issue of fact, unless it is established with reasonable certainty that all other alternatives are impossible! Lutheran Church of Good Shepard [Shepherd] v. Canfield, 233 So.2d 331 (La.App. 1st Cir. 1970), writ refused 256 La. 360, 236 So.2d 497 (La.1970).
We are satisfied that CNG failed to establish that Hydril's phosphatizing process caused the hydrogen embrittlement resulting in the failure of the tubing.
CNG asserts the court erred by refusing to allow a defense expert metallurgist to testify as a rebuttal witness concerning the source of the hydrogen. Sooner had retained the expert, however, after Hydril claimed that hydrogen sulfide in the well caused the embrittlement, Sooner relied on Hydril's defense and called no witnesses. In rebuttal CNG called Sooner's expert metallurgist who testified by deposition that hydrogen sulfide was not a factor and asserted the most probable source of the embrittlement was the phosphatizing process. The court refused to allow him to testify on rebuttal and said:
We're not going to let him deal with any tests, Counsel. This is not proper rebuttal. He's going to have to deal strictly with specific testimony, and his responses will have to be in connection with that specific testimony....
You presented your case. You presented testimony that in the phosphatizing process, the hydrogen embrittlement could have occurred or more than likely occurred during that process.
Counsel for the defendant has come in and said no with his folks. What you would be doing is trying this case all over again by allowing you to now come back and rebut his testimony.
Rebuttal testimony is designed to reach testimony you could not possibly have anticipated. That's why I won't let him give his opinion. Your whole case was built on the phosphatizing process.
The expert's testimony would have been cumulative. Evidence which supplements that already adduced by the plaintiff is not admissible as rebuttal. Rebuttal evidence is confined to new matters adduced by the defense and not to repetition of the plaintiff's theory of the case. Longino v. Shreveport Traction Co., 120 La. 803, 45 So. 732 (1908). The admission of rebuttal evidence is largely within the discretion of the trial judge. O'Bannon v. Azar, 435 So.2d 1144 (La. App. 4th Cir.1983); writ denied, 441 So.2d 749 (La.1983); cert. denied, 466 U.S. 928, 104 S.Ct. 1710, 80 L.Ed.2d 183 (1984).
The trial court properly refused his testimony on rebuttal.
CNG also alleges it was error to disallow the testimony of the chemist who developed Hydril's phosphate coating while allowing his subordinate to render opinions. This expert chemist was not a metallurgist and acknowledged that he was not qualified to testify to the effect of hydrogen on steel. His subordinate, also a chemist, testified that the phosphate coating solution used by Hydril is commonly applied to steel and that he has never known of hydrogen embrittlement resulting from the application of the phosphate coating to steel.
The court properly disallowed the chemist's testimony as to a metallurgical opinion since it was beyond the scope for which he was tendered. The subordinate rendered no metallurgical opinions.
CNG contends the trial court erred in resolving conflicts in expert testimony on the basis of the qualifications of the experts. It maintains that its primary expert, Steven Anderson, tested the faulty tubing *1220 and his tests were relied on by the other experts.
The court stated:
Our jurisprudence requires the trier of fact to consider the professional qualifications of expert witnesses in gauging the weight to be accorded testimony of experts expressing differing opinions. In this regard, this Court could not ignore the fact that the qualifications of defendants' experts were far superior to those presented by plaintiff. This Court does not wish to deprecate "on the job training"it is obviously an important means for the acquisition of knowledge. However, it became crystal clear to this Court that the practical experience of Steven C. Anderson when viewed alongside the professional training and practical experience of John Casner or Dr. Russell Kane, Mr. Anderson does not measure up to their expertise. Holmes v. Southeastern Fidelity Ins. Co., 422 So.2d 1200 (La.App. 1st Cir.1982); writ denied, 429 So.2d 133 (La.1983).
Every Circuit in our state has consistently held that "the weight to be given expert testimony is dependent upon the professional qualifications of the expert and those facts upon which the opinion is based". Our Fourth Circuit Court of Appeal has emphatically stressed that where the testimony of experts differ, it is for the trier of fact to determine what is the most credible evidence. The defendant's (sic) witnesses are so found. State v. Wilco Construction Co., Inc., 393 So.2d 885 (La.App. 4th Cir.1981); writ denied, 400 So.2d 905 (La.1981).
Mr. Anderson is a certified engineering technologist who considers himself to be a metallurgist, however, he does not hold an engineering or metallurgy degree. Hydril's experts, in particular John Casner and Dr. Russell Kane, are considerably more experienced than Anderson and have published several works on hydrogen sulfide environments. Casner is a registered engineer in five states and Dr. Kane holds degrees in metallurgy and material science.
In Bradco Oil and Gas Company v. Youngstown Sheet and Tube Co., 532 F.2d 501 (5th Cir.1976) a similar conflict in expert testimony occurred. In holding the producer failed to prove a hydrogen embrittlement case against the tubing manufacturer, the court found that the experienced producer selected improper materials and failed to conduct a specific test for hydrogen sulfide in the well. This holding parallels the trial judge's conclusion that CNG bears the responsibility for the loss:
On the one hand, plaintiff never offered even a shred of evidence that the phosphate solution employed by Hydril contained H2S (hydrogen sulfide), while defendant offered rational and scientifically plausible evidence that there were traces of H2S in the well.
Finally, and in this Court's view most compelling is the failure of the plaintiff to show that the failure of the tubing was not due to an improper selection or purchase order in the commencement of this operation. Plaintiff made no attempt whatsoever to demonstrate that the specifications for the tubing sent to Sooner would have or should have accomplished plaintiff's purposes unless it was in fact defective.
Where the significant testimony tendered by the parties is conflicting and irreconcilable and the court has no reason to suspect the credibility of the witnesses, the court must find that the proponent has failed to bear the burden of proof sufficient to constitute a preponderance of evidence, in absence of attendant significant physical evidence. Williams v. Bulk Transport, Inc., 266 So.2d 472 (La.App. 4th Cir.1972). Based on the education and experience of the witnesses, we agree that the opinions of Mr. Casner and Dr. Kane should prevail.
The judgment is affirmed.
AFFIRMED.
NOTES
[1] Suit was brought against several defendants who were a link in the handling and processing of the production tubing from its fabrication through delivery to CNG. All defendants except Sooner and Hydril were dismissed through settlement or due to insufficient evidence.