552 So.2d 649 (1989)
Willie J. WHITE, Appellant,
v.
Grady McCOY; Southern Research Company, Inc.; John Willis; Pacific Motor Trucking, a Division of St. Louis Southwestern Railway Company, Appellees.
No. 20934-CA.
Court of Appeal of Louisiana, Second Circuit.
November 1, 1989.
*650 Brenda J. Ford, Mansfield, for plaintiff/appellant.
Wilkinson, Carmody & Gilliam by Arthur J. Carmody, Jr., Steven E. Soileau, Shreveport, for defendants/appellees, John Willis & Pacific Motor Trucking.
Lunn, Irion, Johnson, Salley & Carlisle by Theodore J. Casten, Shreveport, for defendants/appellees, Grady McCoy & Southern Research Co., Inc.
Cook, Yancey, King & Galloway by Eskridge E. Smith, Jr., Shreveport, for intervenor/appellee, Employers Nat. Ins. Co. and Libbey Glass.
Before MARVIN, FRED W. JONES, Jr. and NORRIS, JJ.
NORRIS, Judge.
The plaintiff, Willie White, sued for injuries allegedly sustained when he drove a *651 forklift off a trailer and into the space between the trailer and the loading dock. In response to special interrogatories, a 12-member jury found that neither of the defendants, the trucking company or the security company, was negligent. White now appeals, urging that the jury's findings were manifestly erroneous and that the trial court should have allowed his alleged expert to testify in rebuttal. For the reasons expressed, we affirm.

Facts
White worked for the Libbey Glass plant in Shreveport as a forklift operator, a job he had held for about eight years. On October 19, 1984 he was using the lift to load glassware into a trailer owned by Pacific Motor Trucking ("PMT"). He drove from the platform at loading bay (called "Door") # 7 and into the trailer, carrying the last load of glassware that was to be placed in that trailer. Once inside, he began to see sunlight, which meant the trailer was being pulled away from the door. Realizing the trailer was moving and feeling he had to get off, he quickly backed the still-loaded forklift toward the dock. The trailer, however, was far enough from the dock to leave a gap.
The exact details of White's "fall" were disputed. White testified that the lift's rear wheels snagged on the dock plate, a movable metal ramp on the edge of the dock; at this point he jumped off, but had to scramble up the dock plate and struck his back and arm against parts of the lift and the trailer in the process; an instant later the lift fell to the ground. In an earlier deposition, however, he denied that he struck any part of his body when he jumped. The only other eyewitness, Libbey driver Billy Hines, testified that White did not really fall, but appeared to step off the lift "in the normal manner, just faster" when it was suspended and level with the dock. White appeared to land on his feet on the surface of the dock. The step down from the lift was only two feet. Seconds after the incident, White reported to his foreman, Troy Landrum, that he "landed on his feet" and was OK. The descriptions of a relatively minor "fall" were consistent with the patient history White gave to an early treating physician, Dr. Holladay, whom he saw five days after the incident. Hines testified, contrary to White, that the lift never actually hit the ground. None of the glassware on the forklift was broken.
White received workers comp benefits as a result of this on-the-job accident. Benefits were terminated, however, on March 18, 1985, when reports from Dr. Holladay and Dr. Long indicated that White should be able to return to work. White nevertheless has not returned to work and he brought a workers comp suit which is still pending against Libbey. In the instant tort case, Libbey was insulated from suit; in fact, Libbey employees testified as plaintiff's witnesses. The defendants herein are PMT and its driver, John Willis, who pulled the trailer from the dock; and Libbey's security company, Southern Research Company ("SRC") and its employee, Grady McCoy. White alleged that these defendants' joint and concurrent fault was the cause of his injuries. He did not allege that the defendants violated any applicable rules or regulations.
The following facts about the usual loading procedure at Libbey Glass are assembled from the testimony of Troy Landrum, the warehouse foreman, and Carlene Staser, the warehouse office secretary. The plant is surrounded by a security fence; two main gates in the fence are always locked. At the north gate is a guard house manned by an SRC security guard. A driver seeking to enter either gate must communicate with the guard house by intercom; typically he must identify himself and his company and state his business, either to drop off an empty trailer, collect a loaded one, or both. During daylight hours (when this incident occurred) the guard has no list of trailers to be dropped off or picked up. Rather he must telephone the warehouse office for instructions, which he relays to the driver. Typically the office provided the trailer number of the trailer to be collected. The guard would then let the driver in. In the case of a pickup, there would be a loaded trailer waiting in one of 17 numbered bay doors. Door numbers *652 were painted on the exterior but were not visible to drivers because the trailers blocked them. All witnesses but one verified that pickups and deliveries were identified by trailer number, not door number.
Either before or after hooking up the trailer (there was no set rule about this), the driver would go inside the warehouse and sign the bill of lading, which was in a hamper outside the office. Hines testified that drivers in Libbey's employ must follow a procedure for hooking up, which included first finding out which was the right trailer by going inside the office. He testified, however, that the procedure was different for drivers not employed by Libbey. This detail corresponds with McCoy's testimony that outside drivers relied on the information he gave them before hooking up. Willis testified there was no "normal" procedure for hooking up; a driver might go inside to the office first, but this was not required.
Each of the parties to the incident gave a slightly different account of how it happened. According to Willis, a driver with 37 years' experience, on the date of the incident his dispatcher told him a trailer number he was supposed to pick up; it was one of two PMT trailers to be collected from Libbey that day. Willis was also dropping off an empty. When he reached the gate, he called the guard on the intercom; he waited while the guard telephoned the warehouse office. Willis did not hear their conversation, but afterwards the guard gave him a door number in which to "spot" the empty and, to the best of Willis's memory, the guard gave him a trailer number to collect. Willis dropped off the empty and then headed to Door # 11, where his trailer was. Suddenly McCoy, the security guard, rode up on his scooter, stopped Willis and asked him where he was going. At one point Willis testified the trailer number he received from McCoy did not match the one from his dispatcher; later he said they matched, and the right trailer was in Door # 11. McCoy, however, told him to go back and pick up the other trailer, located in Door # 7. Willis said he did not quarrel because McCoy was in charge of security; besides, his dispatcher might have called later to request the other trailer. Willis therefore went back to Door # 7 and hooked up. He did not go inside the warehouse, either to get his paperwork or to check the contents of the trailer, before hooking up. After he connected the cables and unchocked the wheels, he began to "ease out" three or four feet so he could close the trailer's rear doors, which cannot be done while the trailer is still inside the warehouse door. Suddenly he heard an unusual noise, hopped out of the cab and found the forklift "just about" on the ground. He saw White on the dock, sitting on a concrete post and saying he was not hurt. Willis remarked that he was "DOT certified."
According to McCoy, on the date of the accident Willis came to the gate and called him on the intercom. McCoy in turn called the warehouse office and got the secretary, Ms. Staser, who said to send Willis in. McCoy replied he could not do so without a door number. This is the only reference to a door number; even McCoy, in an earlier deposition, said he always used the trailer number. Ms. Staser replied that there were two PMT trailers; she instructed McCoy to send Willis to Door # 7. He relayed this to Willis, who according to McCoy replied, "I have another trailer number." McCoy repeated that Ms. Staser wanted him at Door # 7, and let him in. When McCoy saw him drive past Door # 7, he got on his scooter, followed and stopped him. Willis said he thought he had the right trailer number, but said he would do what Ms. Staser wanted. McCoy was not aware of any standard procedure for hooking up loaded trailers, although he stated in the deposition that Willis should have gone to the office for his paperwork first. McCoy did not know whose responsibility it was to check that a trailer was completely loaded and safe; the security guard's only duty was to check the driver's paperwork when he returned to the gate to leave. McCoy did not witness the accident; he later learned that a forklift had fallen "so far" into the crack. He prepared an accident report but did not question Ms. Staser, Willis or White. McCoy resigned from *653 SRC for personal reasons shortly after this incident and moved to South Carolina.
Ms. Staser testified that she usually put a packing slip in the back of a loaded truck before calling the carrier. She would then put the bill of lading in her "outer office." The bill of lading, which lists the trailer number but not the door number, was to be signed by the driver. Ms. Staser confirmed that there was no "hard fast rule" about when the driver should take care of the bill of lading. However, if her usual procedure is followed, the bill of lading will not be available until after the trailer is loaded. On the day of the incident, she called PMT's dispatcher and gave them the number of the trailer (not the door number) that was ready. When Willis arrived at the gate, McCoy called her to ask whether the load was ready. She said yes. From this point Ms. Staser has no independent recollection of what she said or did; but she insists she did not tell McCoy to send Willis to the wrong door. She admitted, however, that she had been on the job only four or five months when this happened; Mr. Landrum added that within this short time she had sent trucks to the wrong door on about a dozen occasions. She was "counseled" for the previous mistakes, as well as for this one. She finally stated that after this incident, Libbey instituted a rule requiring drivers to sign the bill of lading before they hooked up.
Much of the testimony focused on what the various parties saw or should have seen from their respective vantage points. Inside her enclosed office, Ms. Staser could not see drivers arriving at the front gate and could not see trailers being loaded. From his guard post, McCoy could not see the door numbers but he could fairly well count the doors and ascertain where a particular trailer was. From outside the warehouse, he could not see whether a trailer in Door # 7 was being loaded, but if Door # 6 were empty he could have climbed inside and looked. Willis, when backing in to hook up to a trailer, could not see whether anybody was still loading it. If he had entered the warehouse before hooking up, he would still not have been in as good a position as Ms. Staser to see the trailer in Door # 7.
Testimony also focused on the respective parties' duties. Mr. Landrum, who testified for the plaintiff, was the warehouse foreman but said his primary duty was not with the truck drivers. He and Ms. Staser established there was no set requirement for the driver to sign the bill of lading and get his copy before hooking up; this was optional. He stated that the security guard was not required to inspect the trailers, but nothing prevented him from doing it. He stated that a driver could not have discerned, from a simple inspection, whether the trailer was completely loaded, but there was nothing to stop him from entering the warehouse and looking. He finally stated that inspecting the trailers was not Ms. Staser's job; in spite of this incident, he felt she had complied with company policy. McCoy testified he had to follow the warehouse office secretary's instructions or else face a reprimand. He did not have to double check Ms. Staser's instructions, though nothing prevented him from doing so. Willis testified he had to follow the security guard's instructions, which he viewed as Libbey's instructions. He corroborated that Libbey had no rule requiring him to do his paperwork before hooking up; sometimes he did it before, but this time he did not.
Because the jury did not reach the issue of quantum, we will only sketch White's medical history. The extent and duration of his alleged injury, like many of his claims, were hotly disputed. Soon after the incident, White visited his family physician, Dr. Sarpy, who was not called to testify. White then went to an orthopedic surgeon, Dr. Holladay, who treated White conservatively for eight visits between October 24, 1984 and March 8, 1985. By March he felt White could return to work. Dr. Holladay testified for the defendants at trial. Meanwhile White saw another orthopedic surgeon, Dr. Long, on referral from Dr. Sarpy, for elbow pain which he had never reported to Dr. Holladay. Dr. Long was not called to testify; according to answers to interrogatories filed in the record, he hospitalized White in January 1985 for *654 an ulnar nerve transposition of the right elbow and a circumcision. The latter procedure was admittedly not related to the fall; and in Dr. Holladay's opinion, the ulnar nerve transposition was not related to it either. Dr. Long released White to work on March 14. Around this time, Dr. Holladay observed that White's conduct was "unusual" in that his physical motions were "guarded" and out of proportion to the pain complained of. Dr. Holladay noted in a letter to Libbey that White disagreed with his diagnosis and would probably seek a second opinion.
Shortly thereafter, White went to the rheumatologist, Dr. Burda, at the instance of his then attorney, Jack Bailey Jr. Dr. Burda diagnosed traumatic fibrositis in March but felt the prognosis was good. (By the time of trial in October 1988, he held to a diagnosis of fibromyalgia, a chronic and permanent condition of sore muscles.) Bailey also sent White to another rheumatologist, Dr. Broadwell, who examined him but was not called to testify. Also at Bailey's instance White saw another orthopedist, Dr. Green, in April 1985. Dr. Green acknowledged White's "multiple severe complaints" but could find no objective symptoms; in fact, his initial impressions were "confused." He felt White could return to work; he recommended counseling for pain management. Dr. Green testified at trial for the defendants.
Two other experts testified for the plaintiff. Dr. Hayes, a psychiatrist, began seeing White in June 1985. He noted White's complaints of "significant" back pain and diagnosed post-traumatic depression. The evidence showed that the incident at Libbey glass was a factor in White's mental condition. The evidence also showed that White failed to report to Dr. Hayes several other incidents in his life that would be equally or more likely to cause the stress; among these were a divorce, custody dispute and criminal proceedings for child support. Ultimately, Dr. Hayes would not exclude the possibility of "compensation neurosis."
Finally there was White's chiropractor, Dr. Zahn, who first examined him in December 1986, over two years after the accident. White reported to him that he "twisted his back" jumping off a forklift. Dr. Zahn testified that White had a pinched spinal cord, disc deterioration and osteoarthritis. These are permanent conditions which Dr. Zahn proposed to treat by adjustments every 30 to 45 days for the rest of White's life. He admitted that osteoarthritis is common and may have predated White's alleged injury.

Action of the trial court
The case was tried before a 12-member jury in October 1988. The plaintiff was represented at trial by his cousin, Murphy J. White. Presentation of evidence took one week.
In the plaintiff's case in chief, he called defendant Willis on cross examination. Willis commented that he was "DOT certified." White's counsel attempted to ask Willis whether "DOT requirements" set a certain procedure for hooking up a loaded trailer. Counsel for Willis and PMT objected. The trial court sustained the objection on grounds that the plaintiff never alleged any violation of DOT regulations and that the jury would decide the issue of negligence on the facts and law as instructed. Plaintiff's counsel did not return to the subject. Later, in the defense's half of the case, Willis repeated on cross that he was "DOT certified." White's counsel again attempted to elicit details about regulations, but was stopped by objections which were sustained. After the defense rested, White's counsel attempted to call a rebuttal witness, a Mr. Calvin White, who is the plaintiff's brother, as an "expert truck driver" to testify about DOT regulations. Willis's counsel again objected and the trial court sustained it, noting that Willis never claimed to have acted in accord with special regulations. Mr. Calvin White was not allowed to testify and the plaintiff offered no rebuttal evidence.
The verdict form contained special interrogatories. The jury found that Grady McCoy and SRC were not guilty of any negligence which was the proximate cause of the accident; and that John Willis and PMT were not guilty of any negligence *655 which was the proximate cause of the accident. The jury therefore did not reach the further questions of Libbey's negligence, the allocation of comparative fault, and quantum.

Discussion: manifest error
By his first assignment White urges that the jury (incorrectly referred to as the "trial court" in brief) committed manifest error in finding that the defendants' conduct was not negligent. White contends that McCoy, as security officer, owed White the duty of protecting him from injuries that might result when a trailer is pulled away from the dock; and that McCoy breached this duty by instructing Willis to hook up the wrong trailer. White also contends that regardless of McCoy's conduct, Willis owed White the duty of checking the trailer before he moved it.
White's action was based on LSA-C.C. art. 2315, which provides in part:
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
A finding of fault must be premised on the existence of a legal duty and a breach of that duty. Whether a legal duty is owed by one party to another depends on the facts and circumstances of the case, and on the relationship of the parties. In all cases, duty can be stated generally as the obligation to conform to the standard of conduct of a reasonable man under like circumstances. Seals v. Morris, 410 So.2d 715 (La.1982). Once applicable standards of care are established, fault or negligence becomes a question of fact to be determined by the trier of fact, judge or jury. Oswald v. Rapides Iberia Mgmt. Ent., 452 So.2d 1258 (La.App. 2d Cir.1984), writ denied 457 So.2d 14 (La.1984). Causation is also an issue of fact and depends on the facts and circumstances of the case. Towns v. Georgia Cas. & Sur. Co., 459 So.2d 124 (La.App. 2d Cir.1984).
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973). Appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the trial court's findings, but mandates reviewing the entire record with an eye to determining whether the finding is reasonable in the context of all the facts. Arceneaux v. Domingue, supra; Watson v. State Farm Fire & Cas. Co., 469 So.2d 967 (La.1985). Findings based on the credibility of witnesses are entitled to great deference. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it, the court of appeal may well find manifest error even in a finding purportedly based on a credibility call. Wilson v. Jacobs, 438 So.2d 1119 (La.App. 2d Cir.1983), writ denied 443 So.2d 586 (La.1983). However, where such factors are not present and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, the finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989), and citations therein.
Appeal lies from the judgment, not the reasons for judgment. Hardin v. Munchies Food Store, 510 So.2d 33 (La. App. 2d Cir.1987); Cason v. Oglesby, 188 So.2d 718 (La.App. 2d Cir.1966), writ denied 249 La. 842, 191 So.2d 642 (1966). We therefore construe the jury's responses to the interrogatories as denying every potential basis of liability contained therein. We have examined the implicit and direct findings for manifest error.
The plaintiff must first prove whether either defendant owed him a duty that encompassed the risk encountered. The jury implicitly found no duty. White contends both defendants had the duty of inspecting the inside of the trailer to see whether it was completely loaded. In support *656 of his position, White cites passages from McCoy's and Willis's respective cross examinations in which each said he "could" have looked inside the trailer and "nothing would have stopped" him from so doing.
Despite these permissive references to what McCoy may have done, there was much evidence to show that checking the trailer's contents was not his duty. Mr. Landrum, Libbey's warehouse foreman, testified on direct that though McCoy could have checked the trailer, it was not his job. R.p. 647. McCoy testified that his job was to "provide plant security, to log tractors and trailers coming in for pick-up and drop-offs, to log people in and out." R.p. 1312. He also testified that he took instructions from the warehouse office. R.p. 706. He maintained that he followed these instructions. The alleged proof of a duty, based chiefly on permissive statements and contradicted by direct evidence, is not very persuasive. Moreover, the wealth of evidence shows that White's activities were not an item that McCoy saw or should have seen from his place in the guard house or alongside the warehouse. Given this evidence, the jury was not plainly wrong in finding plaintiff did not prove that McCoy owed the duty of entering a door or climbing onto the dock to check on the progress of loading a trailer which, according to the office, was ready to roll.
The principal thrust of White's brief is that McCoy breached a reasonable standard of care by not following Ms. Staser's instructions. White argues that Ms. Staser did not explicitly tell McCoy to send Willis to the trailer in Door # 7; but rather McCoy, without authority, sent Willis there without first checking the load. This argument is based on Ms. Staser's testimony on direct examination.
On this point, however, the question of credibility looms large. Mr. Landrum, who was in a position to know, testified that the warehouse officer always gave the guard the trailer number of the trailer to be picked up. Willis verified that he always received this information from the guard. McCoy himself varied the story somewhat by saying he always received the door number.
Of course only McCoy and Ms. Staser were privy to the actual conversation. Ms. Staser's direct testimony does not deny giving McCoy a trailer or door number; she only admitted telling McCoy to let Willis in; she neither affirmed nor denied giving him a number. R.p. 862. Elsewhere she confessed to having no independent recollection of what she said. R.p. 881. On the other hand, McCoy testified positively that she told him Door # 7. R.p.p. 735 (cross), 1317 (direct).
In effect the jury had before it evidence that Ms. Staser should always give McCoy a trailer number; that McCoy's testimony about receiving a door number from her was somewhat conflicting; that McCoy's recollection of the incident was strong, while Ms. Staser's was weak; and that Ms. Staser had a history of sending drivers to the wrong door. Weighing the evidence and the relative inconsistencies of McCoy's and Ms. Staser's testimony, the jury obviously concluded that McCoy obeyed an erroneous order and therefore did not breach any duty to the plaintiff. There are no factors present that would justify us in declaring this plainly wrong. Rosell v. ESCO, supra.
As for Willis, the plaintiff once again asserts this defendant's admission on cross that he could have looked in Door # 6 to see whether the trailer in Door # 7 was loaded. White fortifies this argument by citing that Willis was obliged to go inside to the warehouse office; there he would have seen that the bill of lading was not ready, and he might also have seen White still loading. White finally urges that the excluded testimony of Mr. Calvin White would have established that safety regulations require a driver to check his load in some manner.
The correctness of excluding White's rebuttal testimony is the subject of Assignment No. 2, which we address elsewhere. For purposes of the instant discussion, we would note that evidence of alleged regulations was not before the jury. We decline *657 to speculate as to how this evidence might have affected the verdict.
Mr. Landrum testified there was no "set procedure" requiring Willis to sign the bill of lading and get a copy before he hooked up the trailer. R.p.p. 637, 653. McCoy corroborated this. R.p. 753. Billy Hines, a Libbey employee, outlined a detailed procedure for drivers in Libbey's employ, but admitted there was no such procedure for outside drivers. R.p. 837. Willis himself verified the lack of established procedure. R.p. 800. He added that even if he had entered the warehouse first, he probably would not have been in a position to observe whether anyone was still loading the trailer in Door # 7. R.p.p. 798, 804. Taken together, the evidence does not exclude the possibility that if Willis had gone to the office first, and even if he could not have seen White working in the trailer, he still might have discovered that the bill of lading was not ready; if the bill was not ready, he would have known not to hook up the trailer, and the incident would have been averted. However, the totality of the evidence suggests no manifest error in the implicit finding that Willis owed no duty to proceed in this fashion. Arceneaux v. Domingue, supra.
White also argues that Willis, like McCoy, should have walked into Door # 6 and peered into the trailer in Door # 7 before he hooked up. The evidence as to this "duty" is roughly the same as with McCoy, so we will not repeat it. White's counsel told the trial court that McCoy felt the truck driver ought to see that the trailer is "loaded and safe," but McCoy denied this on the stand. R.p.p. 762, 763. The jury heard all this evidence, as well as counsels' respective arguments. The jury concluded there was either no duty to encompass the risk, or no breach that resulted in the plaintiff's alleged injuries. With this quality of evidence we perceive no manifest error. Rosell v. ESCO, supra.
Because the jury cleared both defendants of negligence, it did not reach the third interrogatory, which addressed the negligence of Libbey or its employees. The instant judgment can be construed as allocating all fault to Libbey. See Hardin v. Munchies Food Store, supra. This implicit finding does not strike us as manifestly erroneous. Libbey, which exercised control over the premises, had the ultimate responsibility of keeping the dock area safe. LSA-C.C. art. 2317. Several witnesses felt that Libbey's loading procedure was ill-defined or unclear; one witness said it was amended after this incident. R.p. 877. Moreover, Ms. Staser had a history of sending truckers to the wrong door; and her supervisor, Mr. Landrum, stated in his investigative report that just such an error may have been the cause of this incident. R.p.p. 631, 632. We do not detect manifest error in the judgment that implicitly assigns all fault to Libbey.
This assignment does not present reversible error.

Exclusion of rebuttal evidence
By his second assignment White urges the trial court erred in refusing to allow him to call Mr. Calvin White, a DOT certified truck driver, to rebut the testimony of defendant John Willis, also a DOT certified truck driver. According to White, Willis testified that there was "no safety requirement to check a trailer to see whether it was safe to be moved." White wanted to call his expert in rebuttal to testify that Willis was indeed bound by such a DOT safety requirement.
We find this argument meritless for various reasons. In the first place, the plaintiff did not allege DOT violations and thus did not place the defendants on notice that these rules would be an issue of the case. We find no error in the trial court's general refusal to allow the plaintiff to introduce evidence about them.
Second, the claim that the defendant violated DOT rules strikes us as a matter which, along with the claims of negligence, should have been advanced in the plaintiff's case in chief. Ordinarily the plaintiff must put in the whole of his evidence on every point or issue which he opens. See 88 C.J.S. Trial, § 94. Evidence in rebuttal must be confined to new matters *658 raised by the defense. Longino v. Shreveport Traction Co., 120 La. 803, 45 So. 732 (1908); Foster & Glassell Corp. v. L'Herisson, 163 So. 755 (La.App. 2d Cir. 1935); CNG Producing Co. v. Sooner Pipe & Supply, 483 So.2d 1215 (La.App. 4th Cir.1986), writ denied 488 So.2d 692 (La. 1986). The evidence clearly supports the trial court's finding that Willis did not assert compliance with DOT rules as a defense. Under the circumstances, even if the plaintiff were entitled to offer this evidence, he should have done so in his case in chief. Refusing his request for rebuttal was not erroneous.
Finally, the trial court has great discretion in controlling the conduct of trial and the presentation of evidence. LSA-C. C.P. arts. 1631, 1632. This includes the power to admit (or refuse to admit) rebuttal evidence. CNG Producing Co. v. Sooner Pipe & Supply, supra; Lea v. Baumann Surgical Supplies Inc., 321 So.2d 844 (La.App. 1st Cir.1975), writ denied 325 So.2d 279 (La.1976). We perceive no abuse of discretion, especially in view of the fact that the testimony which the plaintiff sought to offset by rebuttal actually arose during the plaintiff's case in chief. R.p. 806. The plaintiff was certainly in a position to offer Mr. Calvin White's testimony before he rested his case.
This assignment does not present reversible error.

Decree
For the reasons expressed, the judgment is affirmed. Costs are assessed to the appellant, Willie White.
AFFIRMED.