Judgment rendered November 20, 2019.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,113-CA
No. 53,114-CA
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

| No. 53,113-CA | No. 53,114-CA |
|---|---|
| FURIE PETROLEUM, L.L.C. AND SILVER SPUR ROYALTY COMPANY, L.L.C. | CLOYCE C. CLARK, JR., ET UX |
| Plaintiffs - Appellees | Defendants - Appellants |
| versus | versus |
| SWEPI, LP, ENCANA OIL & GAS (USA), INC., PRIDE OIL AND GAS PROPERTIES, INC., CLOYCE C. CLARK, JR. AND MARTHA CHAMBERLAIN CLARK | EUGENE COPELAND, ET AL |
| | Defendants - Appellees |
| Defendants - Appellants | |

* * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court No. 70733

Honorable Charles Blaylock Adams, Judge

* * * * *

| | |
|---|---|
| LISKOW & LEWIS By: Lawrence Paul Simon, Jr. Brian W. Capell | Counsel for Appellants, SWEPI, LP and Vine Oil & Gas, LP |

CHRISTOPHER LENTO
RYAN M. SEIDEMANN
RICHARD LOUIS TRAINA
Assistant Attorneys General

Counsel for Appellant/
Intervenor, State of
Louisiana

COOK, YANCEY, KING & GALLOWAY
By:  William Drew Burnham
       John Tucker Kalmbach
       Herschel Erskine Richard, Jr.

Counsel for Appellants,
Encana Oil & Gas (USA)
Inc., GEP Haynesville,
LLC, Pride Oil & Gas
Properties, Inc.

BETHARD & BETHARD, LLP
By:  James Guenard Bethard

Counsel for Appellants,
Cloyce C. Clark, Jr. and
Martha Chamberlain
Clark

AYRES, SHELTON, WILLIAMS,
BENSON & PAINE, LLC
By:  Lee H. Ayres
       Ryan P. Telep

D. SCOTT BROWN LAW OFFICE
By:  Daniel Scott Brown

Counsel for Appellees,
Furie Petroleum
Company, LLC, Silver
Spur Royalty Company,
LLC, Briarwood Finance
Co., LLC, and Hydrotek
Resources, Inc.

KEVIN SEVERSON

Counsel for Appellees/
Intervenors, Annie
Laurie Samuels, Harvey
H. Samuels, Jr.,  Karen
O. Lanier, Jamma
Energy, LLC,

Counsel for Appellees,
Lanier Samuels
Properties, LLC, and
Succession of Eugene
Copeland

* * * * *

Before STONE, COX, and THOMPSON, JJ.

COX, J., concurs in the results with written reasons.

THOMPSON, J., concurs for the reasons assigned by J. COX.

**STONE, J.**

This appeal arises from the Forty-Second Judicial District Court, DeSoto Parish, the Honorable Charles B. Adams presiding. Following a 5-day bench trial on the merits, the trial court granted judgment in favor of the Servitude Group,[1] finding that the Landowner Group[2] failed to show by a preponderance of the evidence that Bayou Dolet was navigable when Louisiana was admitted to the Union in 1812. For the following reasons, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This complex litigation explores the intrinsic nature of Louisiana waterways during the state's annexation to the Union. The ultimate issue is whether a certain mineral servitude[3] in DeSoto Parish, Louisiana has prescribed as a result of 10 years of nonuse. The issues of prescription and navigability are bifurcated for our purposes, and this appeal only concerns whether Bayou Dolet was navigable in 1812.[4]

The parties in this case are divided into two groups: the Servitude Group, which maintains that the servitude still exists, and the Landowner Group, which argues that the servitude has prescribed. The Landowner Group argues that Bayou Dolet was formerly navigable, all the way through the tract at issue, and therefore, the tract is noncontiguous, and the mineral servitude would be deemed severed into two separate servitudes by virtue of

---

[1] The Servitude Group consists of the following parties: (1) Briarwood Finance Company, LLC; (2) Furie Petroleum Company, LLC; (3) Silver Spur Royalty Company, LLC; (4) Hydrotek Resources, Inc., Annie Laurie Samuels, the Estate of Harvey Samuels; Karen Lanier; and Jamma Energy, LLC.

[2] The Landowner Group consists of the following parties: (1) the State of Louisiana; (2) Cloyce C. Clark, Jr., and Martha Chamberlain Clark (the "Clarks"); (3) the Clarks' mineral lessees – Vine Oil & Gas LP, SWEPI LP, GEP Haynesville, LLC, and Encana Oil & Gas USA, Inc.

[3] The servitude covers approximately 1,154 acres in Sections 14, 15, 22, and 23 in Township 12 North Range 11 West, DeSoto Parish, Louisiana.

[4] While the underlying issue concerning the viability of the mineral servitude remains to be addressed, the parties stipulated that the issue of navigability should be addressed separately from the viability of the mineral servitude.

La. R.S. 31:64.[5] Conversely, the Servitude group argues that Bayou Dolet was not formerly navigable, and therefore, the tract at issue remains contiguous and the mineral servitude remains whole.

A 5-day bench trial commenced on August 20, 2018, before Judge Charles B. Adams. A total of eight witnesses testified and 12 exhibits were admitted into evidence. The Landowner Group called two fact witnesses: Cloyce C. Clark, the owner of the property, and Cheston Hill, a representative with the State Land Office; and five expert witnesses: Michael P. Mayeux, Phillip N. Asprodites, Dr. Johannes L. van Beek, Dr. Gary D. Joiner ("Dr. Joiner"), and Dr. George J. Castille, all of whom spent considerable time investigating Bayou Dolet.

The Servitude Group called, as its only witness, a hydrologist, Dr. Charles D. Morris ("Dr. Morris"), who had previously examined the property. Following the trial, the Court visited the site and examined the property at issue with all counsel and parties present. At the conclusion of the site visit, the trial court took the matter under advisement. On November 30, 2018, the trial court's "Written Reasons for Ruling on Issue of Navigability" held that the Landowner Group failed to prove by a preponderance of the evidence that there was, more likely than not, a navigable body of water through the subject property in 1812. The Landowner Group filed this timely suspensive appeal asserting the following as its assignments of error:

(1) The trial court erred, as a matter of law, by requiring physical evidence of a channel through the Property, including through Lake Dolet, for Bayou Dolet to be navigable in 1812.

---

[5] La. R.S. 31:46 provides: "an act creating mineral servitudes on noncontiguous tracts of land creates as many mineral servitudes as there are tracts unless the act provides for more."

2

(2) The trial court erred, as a matter of law, by requiring that Bayou Dolet be capable of use in transportation or commerce through the entire year.

(3) The trial court erred, as a matter of law, by requiring evidence that Bayou Dolet was actually used for transportation or commerce.

(4) The trial court erred by precluding the Landowner Group from presenting rebuttal expert testimony.

(5) The trial court committed manifest error by ignoring ample historical and physical evidence of Bayou Dolet's navigability in 1812.

## DISCUSSION

*Standard of Review*

At the outset of this appeal, we address the applicable standard of review. The Landowner Group maintains that the trial court committed legal errors which interdicted the fact-finding process, and thus requires de novo review by this Court. We disagree.

An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Where two permissible views of the evidence exist, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. *Cole v. State Dept. of Public Safety & Corr.*, 2001-2123 (La. 9/4/02), 825 So. 2d 1134; *Stobart v. State through Dept. of Transp. & Dev.*, 617 So. 2d 880 (La. 1993); *Jewitt v. Alvarez*, 50,083 (La. App. 2 Cir. 9/30/15), 179 So. 3d 645. To reverse a fact-finder's determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. *Stobart, supra; Jewitt, supra*.

Even if an appellate court may believe its own evaluations and inferences are more reasonable than that of the fact-finder, the reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Cole, supra; Rosell v. ESCO*, 549 So. 2d 840 (La. 1989). Moreover, where the fact-finder's conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. *Rosell, supra; Jewitt, supra; Jones v. Fin. Indem. Co*., 52,421 (La. App. 2 Cir. 1/16/19), 264 So. 3d 660.

However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence. *Ferrell v. Fireman's Fund Ins. Co.,* 94-1252 (La. 2/20/95), 650 So. 2d 747. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. *Lasha v. Olin Corp*., 625 So. 2d 1006 (La. 1993). Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. *Lasha, supra*; *Evans v. Lungrin*, 97-0541 (La. 2/6/98), 708 So. 2d 731.

In the matter *sub judice*, the Landowner Group's arguments for reversal of the judgment and de novo review are identical, and appear to be a thinly-veiled attempt to argue the merits of this appeal twice. The Landowner Group has failed to cite any alleged errors which would necessitate conducting de novo review. Thus, the central issue before this

4

Court is whether the trial court committed manifest error in finding that the

Landowner Group failed to prove, by a preponderance of the evidence, that

Bayou Dolet was navigable in 1812 when Louisiana was admitted to the

Union.

*Applicable Law*

Public things are owned by the state or its political subdivisions in their

capacity as public persons. La. C.C. art. 450. Public things that belong to

the state are such as running waters, the waters and bottoms of natural

navigable water bodies, the territorial sea, and the seashore. *Id.* Louisiana's

ownership of the beds and waters of the navigable waterways within the

state is by virtue of the Equal Footing Doctrine,[6] later codified in La. R.S.

9:1101, which states in pertinent part:

> The waters of and in all bayous, rivers, streams, lagoons, lakes
> and bays, and the beds thereof, not under the direct ownership
> of any person on August 12, 1910, are declared to be the
> property of the state. There shall never be any charge assessed
> against any person for the use of the waters of the state for
> municipal, industrial, agricultural or domestic purposes.
>
> While acknowledging the absolute supremacy of the United
> States of America over the navigation on the navigable waters
> within the borders of the state, it is hereby declared that the
> ownership of the water itself and the beds thereof in the said
> navigable waters is vested in the state and that the state has the
> right to enter into possession of these waters when not
> interfering with the control of navigation exercised thereon by
> the United States of America.
>
> This Section shall not affect the acquisition of property by
> alluvion or accretion. *See also Ramsey River Rd. Prop. Owners
> Ass'n, Inc. v. Reeves*, 396 So. 2d 873 (La. 1981). A body of
> water is navigable in law if it is navigable in fact. *State v.
> Jefferson Island Salt Mining Co.*, 183 La. 304, 163 So. 145

---

[6] New states are admitted to the Union on an equal footing with the original thirteen. *Pollard v. Hagan*, 44 U.S. 212, 3 How. 212, 11 L. Ed. 565 (1845). When the Revolution occurred, each state became sovereign and acquired the ownership of navigable waters in the state and the soils under them. *Martin v. Waddell's Lessee*, 41 U.S. 367, 16 Peters 367, 10 L. Ed. 997 (1842).

5

(1935). As the outcome of this matter is fundamentally based upon the prior condition and characteristics of Bayou Dolet over two centuries ago, great consideration of all relevant, historical evidence must be given to aid in determining whether Bayou Dolet was formerly navigable. The limited jurisprudence involving Bayou Dolet reveals that as early as 1922, Bayou Dolet was consistently referred to as non-navigable. *See Wemple v. Eastham*, 150 La. 247, 90 So. 637 (1922); *Miami Corp. v. State*, 186 La. 784, 854, 173 So. 315, 338 (1936); *Wemple v. Albritton*, 154 La. 359, 97 So. 489 (1923).

***

Moreover, in reviewing this matter, we find that the trial court closely and carefully considered all the evidence presented. We have also thoroughly reviewed the evidence and applicable law, and find that the record fails to show that the trial court committed manifest error. The evidence in the record reasonably supports a finding that the Landowner Group failed to meet its burden. The evidence not only supports the trial court's conclusion, but also the trial court's reasonable evaluations of credibility and inferences of fact. The trial court rendered a sound, detailed opinion exploring all reasonable hypotheses, conclusions, and assumptions in support of the Landowner Group's argument for navigability. We see no reason to replicate the trial court's analysis, and we, therefore, adopt that portion of the trial court's written reasons for judgment cited below as our own:[7]

> The subject property is depicted in Exhibit M003 by the area in dashed blue and yellow lines. The solid blue line in Exhibit M003 is the landowner group's alleged path of Bayou Dolet. Bayou Dolet is part of the Red River basin that runs from Shreveport to Natchitoches. The parties stipulated that south of the subject property, beginning at least at Bayou Garcie's intersection with Bayou Dolet, Bayou Dolet was navigable in 1812. The parties did not present an evidence regarding the navigability of Bayou Dolet from Bayou Garcie north to the

---

[7] We delete any references to exhibit numbers in the quoted reasons for judgment.

point where Southern Slough meets western hills. Today, the Southern Slough is nothing more than a drainage ditch beside an access road into the subject property. There was no evidence or argument presented regarding the navigability of the Southern Slough in 1812.

The evidence presented to the Court completely focused upon whether there was a navigable body of water from Bayou Pierre south to the point where the Southern Slough meets the western hills. The strongest evidence of navigability that the landowner group presented is the official General Land Office survey for the United States, referred to as the Boyd survey, conducted in the 1830's. The evidence introduced shows that Boyd meandered, from the south, the western bank of Bayou Dolet in the subject tract. However, Boyd did not meander the left descending bank, the eastern bank, of Bayou Dolet, as was recommended for navigable waterways, until he arrived at Bayou Garcie.

The landowner group argues that the act of meandering the western bank shows Boyd believed Bayou Dolet to be navigable. The servitude group argues that Boyd not meandering the eastern bank shows that he did not believe Bayou Dolet was navigable, and that had Boyd believed that Bayou Dolet was navigable, he would have also meandered the eastern bank. Whether Boyd believed Bayou Dolet was navigable or not through the subject property is not known. The lack of a second meander line suggests that Boyd did not believe Bayou Dolet was navigable through the subject property.

*All* of the expert witnesses *agreed* on two (2) fundamental facts. First, the physical characteristics of the subject tract have not significantly changed over the last two hundred (200) years. Second, for Bayou Dolet to have been navigable in 1812, there must have been a channel through the subject tract from Bayou Pierre in the north to the Southern Slough along the western hills in 1812. Thus, if there was not a channel, Bayou Dolet was not navigable in 1812. To determine if there was a channel through the subject tract in 1812, the Court must answer two (2) questions. First, is the point labeled by Boyd as the efflux of Dolet Bayou actually the head waters of Bayou Dolet or the drain for what has been called Lake Dolet? Second, where did the channel flow through the high bank on the north side of Southern Slough, where the Southern Slough meets or met the western hills? (Emphasis added.)

7

Michael Mayeaux, a registered surveyor, testified that Boyd designated the point where Bayou Pierre and Bayou Dolet intersect in the north as the "efflux of Dolet's Bayou." The evidence introduced shows that under ordinary conditions in 1812, Bayou Pierre had higher water levels than are currently found due to the Great Raft on the Red River. Prior to the clearing of the Great Raft, Bayou Pierre was the primary conduit of commerce between Shreveport and Natchitoches. Due to the higher water levels, when Bayou Pierre would run over its banks, aka flood, water would fill the area known as Lake Dolet. Thus, the Court is required to determine whether the water levels in 1812 were ordinarily high enough to allow navigation from Bayou Pierre, into Lake Dolet, and through the subject property. When Boyd surveyed Lake Dolet he noted two (2) locust trees as reference points located in the middle of what should have been Lake Dolet. *Locust trees will not grow or survive in damp soil.* (Emphasis added.) Thus, Lake Dolet could not have an ordinary water level sufficient for navigability while also having the mature locust trees noted by Boyd.

Dr. Johannes van Beek, the landowner group's expert in the fields of physical geography and geomorphology, analyzed the subject tract using Light Detection and Ranging (LIDAR) and generated several maps of the subject tract. Dr. van Beek identified the area directly west of the subject tract as high hills that drained the subject tract. Dr. van Beek testified, based on LIDAR maps, that water in the subject tract would drain northward toward Bayou Pierre along the path of the alleged channel of Bayou Dolet. Dr. van Beek testified that proceeding south from Bayou Pierre through the efflux of Bayou Dolet the bed of its channel rises. Thus*, any water flowing from Bayou Pierre into the alleged channel would have to flow uphill.* During the court's exploration and examination of the subject tract, the Court walked uphill when it proceeded south from Bayou Pierre into the area formerly described as Lake Dolet. Without some force behind it, such as naturally higher water levels than are currently found or flood conditions, the water in the area formerly described as Lake Dolet will drain northward into Bayou Pierre. (Emphasis added.)

Dr. van Beek also took eight (8) soil samples across the subject tract of what he believed to be the most probable locations of the alleged channel. Dr. van Beek testified that the *soil samples did not show any evidence of a channel through the subject tract*. Dr. van Beek testified that the soil at his first and second sample locations showed evidence of a channel, but that area is

8

currently the path water takes when it drains from the subject tract northward into Bayou Pierre. If there was a channel through the subject tract, the sixth, seventh, and eighth sample should have revealed some evidence of the channel. However, those samples did not reveal any evidence of a channel through the subject tract. (Emphasis added.)

Dr. van Beek testified that quite some time prior to 1812 the Red River flowed around Lake Dolet, but over time the Red River shifted to its current bed. In the wake of the Red River's shift, Bayou Pierre remained in the old bed of the Red River. At no time could Dr. van Beek or any other expert witness explain how, why, or when Bayou Pierre flowed uphill and against its current to create the alleged Bayou Dolet channel or what the ordinary water level of Bayou Dolet was in 1812. Webster's New World Dictionary of the American Language, Second College Edition defines an efflux as "1. A flowing out out, or emanating 2. A thing that flows out, outflow; emanation 3. An ending; expiration." Boyd's description of the area as the "efflux of Dolet's Bayou," comports with the current physical characteristics of the property, and all of the evidence presented at trial.

Additionally, for the landowner group's argument on navigability to prevail, water had to have flowed, in Bayou Dolet's ordinary condition, through the high bank on the north side of the Southern Slough, where Southern Slough meet or met the western hills. Dr. van Beek gave a thorough explanation of how high banks and natural levees are formed. Stated simply, high banks and natural levees occur along flowing water bodies due to flooding and depositing of soil. If the flooding from Bayou Pierre was extensive, water would spill over the high bank on the north side of the Southern Slough, where the Southern Slough meets or met the western hills. Today, when flooding is extensive, water will flow south in the subject, as testified to by Mr. Clark. However, flood conditions are not the ordinary conditions required to prove navigability.

As we noted above, Dr. van Beek did not find any evidence of a channel through the subject property near the Southern Slough. During the Court's exploration and examination of the subject tract, the Court could not locate any place where a channel would have flowed through the high banks of the Southern Slough, nor did any expert find evidence of an ordinary flow through the high banks. Today there is an access road from the hills into the flood plain along the former high banks of the

Southern Slough. Even today there is no culvert under that road at any point near where a navigable channel could have been.

The eastern boundary of this tract is the western bank of Bayou Pierre. In the 1880's, Bradford noted a steamboat landing on that stretch of the western bank of Bayou Pierre. There was no evidence of any commercial traffic along the alleged channel of Bayou Dolet. If Bayou Dolet was navigable, why would the landing be located on Bayou Pierre? The only reasonable explanation is that Bayou Dolet was not navigable. Therefore, the Court finds Lake Dolet was nothing more than a flood basin that released its water back to the north into Bayou Pierre unless there was significant flooding at which time water would flow over the north high bank of the Southern Slough and all of the Red River basin would flow south.

Based on the evidence presented, the landowner group failed to prove that there was more likely than not a navigable body of water through the subject property in 1812. The landowner group did not prove that a channel existed through the subject tract from Bayou Pierre in the north to the Southern Slough along the western hills 1812. Because there was a not a channel through the subject tract in 1812, Bayou Dolet was not susceptible of being used, in its ordinary condition, as a highway of commerce over which trade and travel are or may be conducted in the customary modes of trade and travel on water in 1812 from Bayou Pierre to the Southern Slough.

***

*Exclusion of Landowner Group Rebuttal Testimony*

The remaining issue on appeal, not addressed in the above-quoted portion of the trial court opinion, is whether the trial court committed an evidentiary error when it excluded the Landowner Group's rebuttal testimony at trial.

Evidence in rebuttal must be confined to new matters raised by the defense. *Robinson v. Healthworks Int'l, L.L.C.*, 36,802 (La. App. 2 Cir. 1/29/03), 837 So. 2d 714, 720, *writ not considered sub nom.*, 2003-0965 (La. 5/16/03), 843 So. 2d 1120; *White v. McCoy*, 552 So. 2d 649 (La. App. 2 Cir. 1989). The trial court has great discretion in controlling the conduct of the

10

trial and the presentation of evidence, including the power to admit or refuse to admit rebuttal evidence. *Robinson v. Healthworks Int'l, L.L.C.*, 36,802 (La. App. 2d Cir.1/29/03), 837 So. 2d 714; *White, supra.* Rebuttal evidence is that which is offered to explain, repel, counteract or disprove facts given in evidence by the adverse party. *Bickham, supra; Robinson, supra.*

The Landowner Group maintains that by improperly prohibiting rebuttal expert testimony, the trial court precluded them from addressing issues raised by the Servitude Group's sole expert, Dr. Morris. In their appellate brief, the Landowner Group argues that Dr. Morris made the following four opinions/factual conclusions during his trial testimony:

1) There was not an open channel through the property because there were not breaches of the natural levee along Bayou Pierre and in Lake Dolet.

2) Bayou Dolet flowed north in the early 1800's from Lake Dolet into Bayou Pierre, not south as clearly suggested by Boyd.

3) Bayou Dolet was merely an overflow channel at periods of high water, not a perennial bayou.

4) Bayou Garcie may have been the source of water for the perennial flow through lower Bayou Dolet.

The Landowner Group argues that an opportunity for rebuttal would have allowed them to submit new evidence to show the incorrectness and insufficiency in Dr. Morris' expressed opinions. The Landowner Group maintains that it was deprived of the opportunity to present sufficient evidence on these crucial points, and the trial court committed error in denying them an opportunity to present rebuttal testimony. We disagree. The trial transcript reveals the following exchange between the Court and counsels of record:

11

THE COURT: Mr. Severson, is there any – have you rested?

MR. AYRES: Yes, sir.

THE COURT: Okay. You're not- -

MR. AYRES: No, your Honor.

MR. SIMON: Your Honor, we will have a short rebuttal.

THE COURT: I'm sorry?

MR. SIMON: We will have a short rebuttal.

MR. AYRES: We're gonna [*sic*] object to that. Rebuttal is only proper in instances where a new issue is raised, a new defense or new issue is raised in the defense case in chief, which the plaintiffs didn't have any opportunity to address in their case in chief. We've only had one witness and he dealt with exactly the same issue for which they have put on four, almost five days of testimony. There's no way they have a proper rebuttal.

MR. SIMON: That's, that's entirely wrong. They went out there on Sunday- -excuse me. And he came in today and he offered his interpretation based on Sunday's visit. And it's partially what he's said before and partially not. And we'd like the chance to- -

THE COURT: The rebuttal witness would be who?

MR. SIMON: Doctor Van Beek, the hydrologist.

MR. AYRES: Your Honor, and Doctor Van Beek talked ad nauseam about what he saw in that area. Photographs, testimony. Doctor Castille talked about it. He talked about it. There is- - we respectfully object to any questioning- -that area- -subject matter has been covered extensively in their case in chief.
THE COURT: What is different at this point, Mr. Simon?

MR. SIMON: What is different in his dependence on a theory that the water has to flow up—uphill and I want to talk about—what today in the lake there are- -the depths would allow—if there was ordinary low water and Bayou Pierre was fourteen feet higher, you would have water in that lake. And if you had water in the lake, I have the depths that it would be navigable, and to rebut- -and maybe add to it what you asked about the

stream. To have him go specifically to the stream. But it's those, it's those two or three points is what I'm looking at.

MR. AYRES: And, Your Honor, his theory of why he thought the stream was perennial and how much water was in it, and ordinary low and ordinary high, Mr. Simon spent hours covering that in his case in chief. That is not proper rebuttal.

THE COURT: The objection is sustained. No rebuttal as to that extent.

\*\*\*

We find that the trial court did not commit manifest error in precluding the Landowner Group from offering evidence in rebuttal of Dr. Morris' expressed opinions. The trial transcript clearly shows that the Landowner Group failed to articulate to the trial court any new arguments which were not previously advanced in their case in chief to counter the alleged inaccuracies of Dr. Morris' testimony. The Landowner Group offered seven of eight witnesses who testified prior to Dr. Morris. Moreover, the bench trial spanned over five days, four of which were almost exclusively occupied by the Landowners' seven witnesses. Thus, we find that the trial court was well within its discretion to preclude the Landowner Group from offering rebuttal evidence, and this assignment of error is without merit.

## CONCLUSION

For the reasons articulated above, we affirm the trial court decision in favor of the appellees, the Servitude Group, adopt a portion of the trial court opinion as our own, and incorporate that portion by reference. Costs of this appeal are assessed to the appellants, the Landowner Group.

**AFFIRMED.**

**COX, J.,** concurs in the results with written reasons.

I concur with the opinion to affirm the trial court's ruling on the issue of navigability. However, I write separately as I feel this litigation warrants further analysis under the manifest error standard of review, as it involves the entire mineral servitude of over 1,100 acres, and whether Bayou Dolet in the Southeast Quarter of Section 15, Township 12 North, Range 11 West was navigable in 1812.

The trial court was presented with two differing arguments as to whether Bayou Dolet was navigable in 1812. In its role as fact-finder, the trial court's choice between the differing arguments cannot be manifestly erroneous, unless a reasonable factual basis for the finding does not exist. Based on our review of the record, we find that a reasonable factual basis does exist for the trial court's finding that Bayou Dolet was not navigable in 1812.

Dr. Joiner, the Landowner Group's historian expert, testified he could not find any historical documentation of ships or boats on Bayou Dolet. Dr. van Beek, the Landowner Group's expert in physical geography, stated the land elevations have not changed significantly since the early 1800s. Dr. van Beek relied heavily on John Boyd's 1832 survey in making his findings. Dr. van Beek's testimony also revealed that the elevation is generally uphill from Bayou Pierre to the "dam"/efflux of Bayou Dolet.

Boyd's 1832 survey includes two locust trees as reference points in what should have been the middle of Lake Dolet. As revealed at trial and stated by the trial court in its written reasons for judgment, "Locust trees will not grow or survive in damp soil. Thus, Lake Dolet could not have an

1

ordinary water level sufficient for navigability while also having the mature locust trees noted by Boyd."

The Landowner group also called Dr. Castille, an expert in geography and historical geography, to testify. Dr. Castille testified about the cypress trees found along Bayou Dolet. He testified that the lack of old growth cypress trees in certain areas of Dolet indicates there was perennial water, in which the trees would not have been able to germinate and grow. He said the lack of old growth trees at the northern end of Bayou Dolet could be the result of logging activities, but he could not point to any historical evidence of logging in the area.

The Servitude Group called one witness, Dr. Morris, the only hydrology expert to testify. Dr. Morris stated that when reviewing the historical data, the State Engineer's Report of 1843 was "very important" because it "has the only factual information in 1812." The 1843 State Engineer report states:

> In 1805 there was no passage by the way of the present Bayou Pierre; most of the existing lakes were dry and timbered. The water commenced running through, forming a channel, after the raft in the Red River had advanced near Shreveport, but gained but little until 1815; from this time the increase was slow but regular until 1828, when it took a new impulse[.]

The flood of 1828 occurred prior to Boyd surveying the area. The State Report states that the water in the Red River after the 1828 flood exceeded that of the 1840 flood. The State Report, which is dated January 1843, after water from both floods filled the area, states that the opening of Bayou Pierre would reclaim a large amount of extremely valuable lands.

Dr. Morris was of the opinion that the area the Landowner Group called a channel on the west side of the lake was actually caused by drainage

2

from the hills west of Dolet, which then flowed north into Bayou Pierre. His testimony revealed that Bayou Pierre would have only flowed into Dolet during a flood. During cross-examination, Dr. Morris stated that he only observed the property and did not take any measurements or data. He explained that he did this because it was his opinion that Dolet was intermittent and not a perennial stream.

The pictures included in the exhibits show that while standing in the channel, Bayou Pierre is lower in elevation than Bayou Dolet. Dr. Morris stated that he followed a drainage channel north from the culvert all the way to where the drainage channel intersects with Bayou Pierre. He stated that as the channel got close to Bayou Pierre, it took a sharp right turn, which was significant because it meant that "when Bayou Pierre is flooding up on some- -up in this area, then the water- -the storm water coming down would tend to be turned in the direction the river was flowing, and that had an impact on the formation of this channel." He agreed that that a good visual is an interstate on-ramp—it connects in the same direction traffic is already flowing.

Cases from the 1900s involving Bayou Dolet contain insight into how Dolet was viewed 100 years ago. *Wemple v. Eastham*, 150 La. 247, 90 So. 637 (1922) states, "Defendants admit that Dolet [B]ayou is not, and never has been, a navigable stream, and that the state therefore had no right to lease the bed or bottom of that bayou, within the boundary lines of plaintiff's land." The State was not a party to the suit, but was deemed to not be the mineral owner of certain waterways, including Section 15 (12N-11W). Previously, when *Wemple v. Eastham*, 144 La. 957, 81 So. 438 (1919) was first before the La. Supreme Court, Eastham alleged at the trial court that the

3

State's mineral lease was valid because the streams were formerly navigable, and that therefore the title to the beds was in the State. It is interesting that from 1919 to 1922, the defendants changed their argument and agreed that Dolet was non-navigable.

In *Wemple v. Albritton*, 154 La. 359, 97 So. 489 (1923) and *Smith v. Albritton*, 153 La. 507, 96 So. 49 (1923), the La. Supreme Court stated that although the land was subject to overflow, it was not selected as part of the Swamp Grant process. The *Wemple v. Albritton* Court stated, "[D]efendant has therefore failed to show title ever passed from the United States to the state for the land in controversy, and has also failed to show that title to said land passed to the state as being the bed of a navigable stream at the date of the admission of the state into the Union... The title to said land never having vested in the state[.]" Again, the State was not a party in these cases, which is why this Court allowed this mineral interest dispute to be revived 100 years after the 1900s cases, and over 200 years after the State was admitted into the Union.

In regards to the requirement of a channel to prove navigability, the trial court stated in its written reasons for judgment:

> All of the expert witnesses agreed on two (2) fundamental facts. First, the physical characteristics of the subject tract have not significantly changed over the last two hundred (200) years. Second, for Bayou Dolet to have been navigable in 1812, there must have been a channel through the subject tract from Bayou Pierre in the north to the Southern Slough along the western hills in 1812. Thus, if there was not a channel, Bayou Dolet was not navigable in 1812. To determine if there was a channel through the subject tract in 1812, the Court must answer two (2) questions. First, is the point labeled by Boyd as the efflux of Dolet Bayou actually the head waters or Bayou Dolet or the drain for what has been called Lake Dolet? Second, where did the channel flow through the high bank on the north side of Southern Slough, where the Southern Slough meets or met the western hills?

4

The trial court looked to the existence of a channel because the experts agreed that for Bayou Dolet to have been navigable, there must have been a channel. Dr. van Beek took eight samples of the soil in areas where he believed the channel would have run. Dr. van Beek testified that the soil samples did not show any evidence of a channel through the subject area. Although the trial court lists the lack of a channel as one of the reasons it found against navigability, it was not the sole reason. The following, taken from the trial court's written reasons for judgment, are some of the reasons that the trial court found against navigability:

> Boyd did not meander the left descending bank, the eastern bank, of Bayou Dolet, as was recommended for navigable waterways, until he arrived at Gracie Bayou.

> Locust trees will not grow or survive in damp soil.

> [T]he water in the subject tract would drain northward into Bayou Pierre along the path of the alleged channel of Bayou Dolet.

> During the court's exploration and examination of the subject tract, the Court walked up hill when it proceeded south from Bayou Pierre into the area formerly described as Lake Dolet.

> Dr. van Beek testified that the soil samples did not show any evidence of a channel through the subject tract.

The strongest evidence in favor of navigability is John Boyd's survey, which did not occur until about 20 years after 1812, and the lack of old growth cypress trees. Based on the testimony and historical evidence, taken as a whole, and after the trial court walked the property, the trial court had a reasonable basis for its decision and was not clearly wrong. This assignment of error lacks merit, and I agree to affirm the trial court's decision.

Additionally, the State of Louisiana is part of the Landowner Group, which has been assessed with costs in the opinion. The State of Louisiana

5

owes their deferred costs pursuant to La. R.S. 13:4521. The deferred costs owed by the State of Louisiana in this matter is $1,997.25.